[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-13035

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 3, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-00157-CR-2-JHH-RRA

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID L. VANCE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(August 3, 2007)**

Before PRYOR, KRAVITCH and ALARCÓN,[*] Circuit Judges.

ALARCÓN, Circuit Judge:

David L. Vance appeals from the judgment of conviction and the District

Court's sentencing decision. He contends that the District Court committed plain

---

[*]Honorable Arthur L. Alarcón. United States Circuit Judge for the Ninth Circuit, sitting by designation.

error in sustaining the prosecutor's objection to the admission of an extra-judicial statement.  He also asserts that the District Court erred as a matter of law in concluding that he unduly influenced a minor to engage in prohibited sexual conduct, and in enhancing his base offense level based upon its finding that his offense involved the use of a computer to solicit a minor to engage in prohibited sexual conduct.  We affirm because we conclude that the District Court did not abuse its discretion in its evidentiary ruling, nor did it clearly err in its findings in support of its sentencing decision.

## I

Viewing the evidence in the light most favorable to the Government as the prevailing party at trial, the record shows that, as part of an ongoing undercover sting investigation, Captain John Crane of the Birmingham, Alabama Police Department posted a message on a Yahoo! web site serving a child pornography group called "texashottestteens."  The subject line for that group was "Tiny Interest Trips."  Captain Crane's message advertised the availability of minors for sexual activity.  Captain Crane's posted message reads as follows:  "Tiny Interest Companions. Lolita - VYB - VYG.  Private travel opportunities available.  (Costa Rica).  Discretion assured.  E-mail for details."[1]

---

[1]Captain Crane explained at trial that "Lolita" referred to an underage girl, "VYB" meant "very young boy," and "VYG" meant "very young girl."

The message listed "tiny_interest@yahoo.com" as the e-mail address. It also provided that if that e-mail address had been deleted by Yahoo!, the person posting the advertisement could be contacted by using the e-mail address "xxtinyholzxx@yahoo.com."

Captain Crane testified that in this sting operation, he did not single out any person to entice them to respond to his advertisement. Instead, he waited until he received a response to his advertisement. In his role as a feigned procurer, Captain Crane's message provided persons seeking to engage in prohibited sexual conduct with minors the opportunity to use him as their agent to carry out their intent.

On January 18, 2005, Mr. Vance sent an e-mail to Captain Crane in which he stated "details please."[2] Mr. Vance identified his e-mail address as "rocketpwr11234@yahoo.com." Captain Crane responded as follows:

> I got your email inquiry. Tiny Interest Companions utilizes a private aircraft and flight plan from a medium sized airport. This insures privacy for our clients since a group-style manifest is filed. The destination includes private clubs located in Costa Rica. These very exclusive clubs offer a variety of choice of VYG's to VYB's. Travel, accommodations for 2 nights / 3 days and companion are all included in the price. 25% is due at takeoff with the balance due prior to return. Specific questions, desires and expectations can be emailed but for obvious reasons, there is not a website and PayPal is not accepted.

---

[2]All the correspondence between Captain Crane and Mr. Vance was by internet e-mail.

3

Mr. Vance replied: "ive always wanted to go to costa rica what are ur prices, and whats included." Captain Crane's response stated:

> A buddy of mine is a corporate pilot and the company lets him use the jet twice a year. We go down to Costa Rica (we try to avoid the U.S. anyway) from a private gate at a medium sized metro airport in the Southeast USA. We stay at the Best Western Downtown San Jose, which is about 14 miles from the Juna Santamaria International Airport. The cost is about $58 dollars a night which is included. The rate is $1,500.00 which covers the trip, hotel, 2 Nights with VYG / VYB (what age span were you interested in and what you wanted to do - no pain!!!) I send an email to our contact there to have things set up - you choose the one you want at the club) and that rate leaves a profit margin that my buddy and I split. If you are still interested, we can go from there. We are looking at around the 18 of Feb. or 11th of March.

Mr. Vance's next message stated: "What no drinks come on its first time down there.What other islands are near?any pics i like to get a feel of what iam goin [sic] going to see. g12 15." On February 2, 2005, Mr. Vance replied as follows: "i cant wait i bet its warm down there rip off what do u mean. fem 12-17 whats next."

Captain Crane's next message stated:

4

Next, I need to know what do you want to do with the girls so we can line up the appropriate ages before we get there. 25% ($375) is required prior to departure. We [sic] way we do that is that you physically cut the money in half with a pair of scissors. Send half the bills with a photocopy of the "front" of your passport (I don't want your name or anything, but you have to have one to get back into the U.S. and I just want to make sure you do). Bring the other half of the bills with you for when we get on the jet going down. The balance ($1,125) is due before we come back. If this is satisfactory, let me know along with your expectations and I'll send you the address.

Mr. Vance replied: "them with each other and inter core with m E of course what else give me ideas, about the other well no problem with money but passport i dont know can i black out every thing or just insure u i have one will be enough."

In reply, Captain Crane stated:

Several things I wanted to let you know. We got the plane for the 11th of March. I emailed my contact in Costa Rica and he let me know what he had available. If you wanted two to have sex with each other and intercourse with you here is what he has initially set up for the nights there:
Marguarite - 12 years old
Vittoria - 13 years old
Maria - 15 years old
Juanita - 17 years old

If you wanted two of a specific age, I can email him back so he can make arrangements. I did't want to commit to anything until I heard from you so let me know which ones interest you and he'll have them there. Believe me, they are very attractive....he has never let me down

5

before. I like mine a little younger and have already put
my order in.

Last of all, you can mail me at:

T.I. (for Tiny Interest)
P.O. Box 5231
Birmingham, AL 35207[3]

Mr. Vance responded: "that works for me now i can mix and match and two one night or how ever depending on how many nights we are there then.Or did i have to pick out of the bunch." Captain Crane replied: "We will be leaving from the same city as my mailing address and it is a pain to transport 6 kids at one time. If you are interested in two of them, let me know. That way my contact will be bringing mine, my buddy's and your two." Mr. Vance replied: "that helps I don't have your original e-mail with the names but i think these will do 13 and 15 or very close OK thks."

On February 23, 2005, Captain Crane informed Mr. Vance that they should meet on March 11, 2005, at the Birmingham Airport. On March 3, 2005, Captain Crane sent another message to Mr. Vance explaining the details of the meeting. It provided:

OK, I will be in the baggage claim area of Birmingham
Airport on Friday morning at around 6:30. If I remember
right, there is a small office area off to the left. I will be

---

[3]The minors described by Captain Crane in this e-mail were fictitious.

hanging out there and you can meet me. I will wear tan khaki pants and a dark red (maroon) long sleeve shirt and carrying a small black suitcase. I have a moustache and dark hair...about 6 feet tall. We can go from there and walk to the private aircraft terminal which is about 100 feet away. We will leave Friday around 7:00 am and we will come back Sunday afternoon, arriving about 5:00 pm. There are several hotels around the airport...a Holiday Inn Express and a Days Inn which are about a mile and a half from the terminal (in case you got in early). If anything should come up (and I am really trusting you here) here is a number you can reach me at: 205-954-2987 if there is anything else you need just let me know. By the way, my name is John for when we meet. Also just to make sure, the address I gave was TI, P.O. Box 5231, Birmingham, AL 35207
Talk at ya later,
John

On March 11, 2005, Captain Crane went to the Birmingham Airport to meet Mr. Vance, if he chose to appear. Captain Crane was accompanied by law enforcement officers who were working undercover as an airline pilot, and as fellow passengers on the proposed trip to Costa Rica. After Mr. Vance approached Captain Crane they proceeded to a private air terminal. There, Mr. Vance, Captain Crane, and his fellow undercover law enforcement officers were arrested. The officers were arrested to maintain their undercover status.

After Mr. Vance was arrested, Captain Crane searched a bag carried by Mr. Vance. It contained his driver's license, his passport, one-half of paper currency in the amount of $375 and $553 that had not been cut, traveler's checks totaling $750,

and a copy of an e-mail sent by Captain Crane on March 3, 2005, describing where Mr. Vance should meet him on March 11, 2005. Mr. Vance's bag also contained thirteen condoms.

On March 30, 2005, a federal grand jury indicted Mr. Vance for "knowingly attempt[ing] to travel in foreign commerce from the State of Alabama to a foreign country for the purpose of engaging in illicit sexual conduct with other persons, in violation of Title 18, United States Code, Sections 2423(b) and (e)."

## II

## A

Mr. Vance testified on his own behalf at trial. Mr. Vance's attorney asked Mr. Vance why he responded to Captain Crane's Yahoo! message. Mr. Vance stated: "Well, I figured by requesting details, I may or may not be able to gather more information." Mr. Vance's attorney inquired further: "And with that information, you were going to do what?" Mr. Vance replied: "Turn it in to Yahoo! to try to get it shut down as a group."

Mr. Vance testified that after he was arrested, law enforcement officers told him that they were investigating "John."[4] They told him they needed his help in gathering information about John and the pilot.

---

[4]Mr. Vance referred to Captain Crane as "John" because Captain Crane informed him on March 3, 2005, that that was his first name.

8

Mr. Vance gave a statement to the officers. It was written down by one of the officers. The statement reads as follows:

> My name is David Vance. My birth date is August 28, 1977. . . . I have an Internet account with SBC Global. My screen name is DLVVANCE1@SBCglobal.net. I have a Yahoo! e-mail address which is rocketpwr11234@yahoo.com.
>
> I began corresponding by e-mail with a man who said he had a business called Tiny Interest. He advertised that he would take people to Costa Rica to have sex with underage children. I corresponded with him to catch him and turn him into the police.
>
> I told him I wanted to have sex with girls in the age range of 12 to 15 years old because I knew that was illegal and that John, with Tiny Interest, would get in trouble.
>
> I started trying to catch pedophiles when child pornography sites kept popping up on my computer. I looked at the pictures and thought they were bad. I looked at the FBI website and it said not to go to child pornography websites. But I did not know how to turn them in if I didn't go to the websites. I realized I probably should not have gone to these websites.
>
> My wife has seen some child pornography pictures on my computer. She did not approve of them but she trusts me. I have been to Yahoo! groups and message boards where people were trading child pornography. I told them I had a collection and I offered to send them pictures, if they would send some first. None of them sent any pictures. I did not have any pictures to send them.
>
> Some groups have child pornography pictures posted in them. I have also seen child pornography pictures on Kazaa. I do not like that program because it's like going into other people's computers, so I did not use it.

9

The last time I used Kazaa to view child pornography was about 1999 or 2000, when I had my old computer. I never sent or received child pornography because I knew it was illegal and I have tried not to download too much of it. So mostly I look at websites but did not download them.

When I decided to respond to Tiny Interest, I was not sure if I really wanted to go through with it. But after I had sent the money in to John, I felt like I had invested too much to go back.

I sent John $375 which were bills cut in half. I told John I wanted to have sex with a 13-year-old and a 15-year-old girl in Costa Rica. When we got there, I was going to pretend that I was not interested in doing that.

I told my wife that I was going to Tennessee for a training course. I told my two cousins that I was going to Costa Rica for spring break. I did leave my wife a note, however, that I was doing what I was doing for her and our children.

I know that having sex with a 13-year-old and a 15-year-old girl was wrong in this country. I do not know that it was wrong to fly outside the country and do this. But I figured John was doing something illegal.

I have never had inappropriate conduct with children. I wanted to catch John by going to Costa Rica. I realize that the FBI and the police do not want people to try to catch pedophiles because, in doing so, they have to engage in the same activities as pedophiles.

I make this statement voluntarily. No threats or promises have been made to me.

This statement was entered into evidence as Defendant's Exhibit 1.

Mr. Vance also made an oral statement to the police after his arrest. He told the officers that he was "going to try to report as much as possible and shut down as many groups as possible." He further told the officers: "I was going to go over

there and then once I got there, I was going to pretend not to be interested, and go to the nightclubs instead."

Mr. Vance also testified that he left his wife a letter in a file cabinet in his home which he had drafted two hours before he left on his trip. The letter stated:

> I am doing this to help children all around. I hope this works and I don't end up dead. If so I love you guys very much and I hope u understand why I did this. I love my children and hope to put people in jail were [sic] they belong.
> I love you Babe

Mr. Vance further testified that prior to his trip, he informed his cousin, James Aaron St. John, that he "was going to Costa Rica to help children to gather information to stop John and that if anything happened to me, to take care of my family."

On cross examination, the prosecutor questioned Mr. Vance as follows: "I want to refer, still looking at your interview [with the FBI after the arrest], Page 3, Defense Exhibit 3 [sic]. You said in that second paragraph, 'I told my wife I was going to Tennessee for a training course.' Do you see that?" Mr. Vance stated: "Yes, sir." The prosecutor asked: "Of course that was a lie, wasn't it?" Mr. Vance responded: "Yes, sir." The prosecutor then inquired: "When the FBI asked you about it, you [didn't] tell them, I told two cousins that I was going to Costa Rica as part of my investigation to save children from being raped?" Mr. Vance

11

replied: "That's correct." The prosecutor followed-up this question by asking: "The only thing you told the FBI, the day that you were interviewed about it is, I was going on spring break to Costa Rica?" Mr. Vance responded: "Yes, sir."

**B**

Mr. St. John testified at trial as a defense witness. He testified that he spoke with Mr. Vance at a restaurant in Clovis, California in March of 2005, and on a telephone call when Mr. Vance was in Birmingham, Alabama. Mr. Vance's counsel asked Mr. St. John: "What was [sic] the details of the conversation?" The Government objected, stating: "Your Honor, we're going to object to hearsay at this point." Before the District Court could rule on the Government's objection, Mr. Vance's counsel asked the witness: "What did you learn from David based on that conversation? That he was not going to –." Government counsel stated: "Same objection." The District Court sustained the objection. Mr. Vance's counsel did not object to the District Court's ruling that the extra-judicial statement was inadmissible, nor did he make an offer of proof, or argue that the testimony was admissible as a prior consistent statement to prove that his testimony was not a recent fabrication.

The jury found Mr. Vance guilty as charged in the indictment.

**III**

12

The presence investigation report ("PSR") prepared for the District Court set forth a two-level enhancement under U.S.S.G. § 2G1.3(b)(2)(B), on the ground that Mr. Vance unduly influenced a minor to engage in prohibited sexual conduct; and a two-level enhancement under U.S.S.G. § 2G1.3(b)(3)(B), based on Mr. Vance's use of a computer to entice, offer, or solicit a person to engage in prohibited sexual conduct with a minor. The PSR recommended that Mr. Vance's total offense level should be 32. His criminal history category was III. His Sentencing Guidelines range was 151 to 188 months.

At his sentencing hearing, Mr. Vance objected to the application of the enhancements set forth in §§ 2G1.3(b)(2)(B) and 2G1.3(b)(3)(B). He argued that he could not have unduly influenced the minors as they were fictitious. He also asserted that he did not use a computer to solicit a minor. He contended that Captain Crane used a computer to solicit him to engage in prohibited sexual conduct with a minor.

The District Court overruled Mr. Vance's objections. It held that the existence of an actual minor was not necessary for an enhancement under § 2G1.3(b)(2)(B). It also found that the sentencing enhancement was warranted because Mr. Vance "was directing someone, who had total control, over the variety of suggested victims to supply the ones that [he] wanted."

13

The District Court sentenced Mr. Vance to serve 180 months in prison, to be followed by 300 months of supervised release. Mr. Vance has timely appealed from the judgment of conviction and the District Court's sentencing decision. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1)-(2).

**IV**

**A**

Mr. Vance contends that the District Court erred in sustaining the Government's objection to testimony by Mr. St. John regarding the substance of his conversation with Mr. Vance. He argues before this Court that Mr. St. John would have testified that Mr. Vance told him he was going to Costa Rica to help children. Mr. Vance maintains that this statement was admissible as a prior consistent testimony.

"A district court is granted broad discretion in determining the admissibility of a prior consistent statement under Fed.R.Evid. 801(d)(1)(B) and will not be reversed absent a clear showing of abuse of discretion." *United States v. Prieto*, 232 F.3d 816, 819 (11th Cir. 2000). However, "[w]here a party makes no objection in the trial court to the matter complained of on appeal, our review is for plain error." *Id.* Plain error exists "only where (1) there is an error; (2) the error is plain; (3) the error affects the defendant's substantial rights in that it was

14

prejudicial and not harmless; and (4) the error seriously affects the fairness, integrity or public reputation of a judicial proceeding." *Id.* Mr. Vance failed to argue to the District Court that the statement was admissible as a prior consistent statement. He also failed to make an offer of proof that he would present evidence that Mr. Vance's testimony was not a recent fabrication. Therefore, we must review the District Court's exclusion of the testimony for plain error.

Pursuant to Rule 801(d)(1)(B) of the Federal Rules of Evidence, a prior consistent statement by a witness is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement," and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." There are exceptions to this rule. First, "prior consistent statements are treated as admissible non-hearsay *only* if they are offered to rebut a specific allegation of recent fabrication, not to rehabilitate credibility that has been generally called into question." *United States v. Drury*, 396 F.3d 1303, 1316 (11th Cir. 2005) (emphasis in original). Second, to be admissible under Rule 801(d)(1)(B) "the [prior] consistent statements must have been made before the alleged influence, or motive to fabricate, arose." *Tome v. United States*, 513 U.S. 150, 158 (1995). This Court has explained that the question "whether a witness

15

had a motive to fabricate when prior consistent statements were made is plainly a question of fact to be resolved by the trial court based precisely on the particular circumstances of an individual case" and that determination is entitled to great deference on review. *Prieto*, 232 F.3d at 821. The failure of Mr. Vance to argue that Mr. St. John's testimony was admissible under Rule 801(d)(1)(B) deprived the District Court of the opportunity to make a finding regarding whether Mr. Vance had the motive to fabricate when he spoke to Mr. St. John.

Mr. Vance contends that the Government impliedly accused him of fabricating his testimony that his intent, in responding to Captain Crane's advertisement, was to gather evidence to assist law enforcement. During cross-examination, the prosecutor asked Mr. Vance why he had not told the officers after his arrest that he had stated to Mr. St. John that the purpose of his trip was to help children. Mr. Vance's written statement indicates that he informed Mr. St. John and another cousin that he was going to Costa Rica for spring break.

Mr. Vance has failed to demonstrate that he did not have a motive to fabricate his testimony before he spoke to Mr. St. John. At the time he spoke to Mr. St. John, Mr. Vance had already sent e-mails to Captain Crane expressing his interest in engaging in illegal sexual conduct with minors. The District Court did

16

not commit plain error in excluding Mr. St. John's testimony regarding his conversations with Mr. Vance.

**B**

Mr. Vance contends that the District Court erred in overruling his objection to the imposition of a two-level base offense increase for unduly influencing a minor to engage in prohibited sexual conduct pursuant to U.S.S.G. § 2G1.3(b)(2)(B).  He argues that there is no evidence that he exerted any influence over a minor.  He also maintains that § 2G1.3(b)(2)(B) is inapplicable where a defendant has selected fictitious minors for prohibited sexual conduct from a list provided by an undercover officer.

This Court reviews a District Court's interpretation of the Sentencing Guidelines *de novo*, and its factual findings for clear error.  *United States v. Jordi*, 418 F.3d 1212, 1214 (11th Cir. 2005).  Section 2G1.3(b)(2)(B) provides that the base offense level should be increased by 2 if "a participant [of the crime] otherwise unduly influenced a minor to engage in prohibited sexual conduct."  Application Note 1 of § 2G1.3 provides that "'Minor' means . . . an individual, whether fictitious or not, who a law enforcement officer represented to a participant (i) had not attained the age of 18 years, and (ii) could be provided for the purposes of engaging in sexually explicit conduct."

17

This Court held in *United State v. Root*, 296 F.3d 1222, 1233 (11th Cir. 2002) that, under U.S.S.G. § 2A3.2 (2000),[5] "an undercover officer playing the role of a minor victim qualifies as a victim, thereby making an actual victim unnecessary." This Court reasoned that § 2A3.2 (2000) was enacted for the purpose of "ensuring that offenders who are apprehended in undercover operations are appropriately punished." *Id.* at 1234 (internal quotation marks omitted).

This Court held in *Root* that "when an undercover officer is the recipient of communications related to the commission of a sex crime offense and no actual child is involved, a district court considering an undue influence enhancement, under § 2A3.2(b)(2)(B), must focus on the offender's conduct." *Id.* The Court explained that a contrary "interpretation would [] undermine the Sentencing Commission's stated purpose in amending the definition of victim under § 2A3.2 of ensuring that offenders who are apprehended in an undercover operation are appropriately punished." *Id.* (internal quotation marks omitted).[6]

[5]Application Note 1 to U.S.S.G. § 2A3.2 (2000) provided that: "Victim" includes "an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 16 years."

[6]In his brief, Mr. Vance reminds us that two of our sister Circuits have expressly declined to follow this Court's holding in *Root* that the sentencing enhancement set forth in § 2A3.2(b)(2)(B) is applicable in a sting operation where the minor is fictitious. *See United States v. Mitchell*, 353 F.3d 552, 562 (7th Cir. 2003) (holding that "[w]here the state of mind of the victim is critical, and perhaps dispositive, it simply cannot apply in the case where the victim has no state of mind whatsoever because she does not exist"); *United States v. Chriswell*, 401 F. 3d 459, 469 (6th Cir. 2005) (holding that "§ 2A3.2(b)(2)(B) is not applicable where the victim is an undercover agent representing himself to be a child under the age of sixteen"). We, of course, are bound to follow the

18

In *United States v. Murrell*, 368 F.3d 1283 (11th Cir. 2004), this Court held that sentencing enhancements can be applied even though the defendant only communicated with a male undercover officer who was posing as the father of a fictitious thirteen-year-old daughter. *Id.* at 1289-90. In *Murrell*, the defendant was convicted, under 18 U.S.C. § 2422(b), of "using a facility of interstate commerce to attempt to knowingly persuade, induce, entice, or coerce a minor to engage in unlawful sexual activity." *Id.* at 1284. This Court held that the District Court properly enhanced the defendant's sentence under U.S.S.G. § 2G1.1(b)(2)(B) (2003), a similar Sentencing Guidelines provision to § 2G1.3(b)(2)(B). *Id.* at 1289. The 2003 version of § 2G1.1(b)(2)(B)[7] provided that a defendant should receive a two-level sentencing enhancement for "an offense involving a victim between the ages of twelve and sixteen." *Id.* at 1288 (internal quotation marks omitted).

This Court explained in *Murrell* that "[b]ecause the Sentencing Commission specifically provided that undercover officers are victims for purposes of § 2G1.1,

---

law of this Circuit. *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993) ("it is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc or by the Supreme Court").

[7]Section 2G1.1(b)(2)(B) (2003) provides that for crimes relating to "Promoting A Commercial Sex Act or Prohibited Sexual Conduct" "[i]f the offense involved a victim who had . . . (B) attained the age of 12 years but not attained the age of 16 years, increase [base offense level] by 2 levels."

19

we deduce that the enhancement is directed at the defendant's intent, rather than any actual harm caused to a genuine victim." *Id.* at 1289 (internal quotation marks omitted).[8] "Thus, the enhancement applies whether the minor 'victim' is real, fictitious, or an undercover officer." *Id.*

In *United States v. Lebovitz*, 401 F.3d 1263 (11th Cir. 2005), this Court affirmed the District Court's decision to enhance a defendant's sentence under U.S.S.G. § 2A3.1(b)(2)(A) (2003), after the defendant "pleaded guilty to traveling in interstate commerce with the intent to have sex with a minor, in violation of 18 U.S.C. § 2423(b)." *Id.* at 1265. The defendant in *Lebovitz* responded to an internet bulletin board message posted by then Lt. John Crane of the Birmingham Police Department as part of a sting operation to catch pedophiles preying on children. *Id.* The message was entitled "teengirls4men." *Id.* Lt. Crane, using an alias, e-mailed a response to the defendant, posing as a father with three fictitious children under the age of twelve who would be available for sex. *Id.* at 1265-66. Section 2A3.1(b)(2)(A) (2003) provided that "[i]f the victim had not attained the age of

---

[8]Application Note 1 to U.S.S.G. § 2G1.1 (2003) provided that:

> 'Victim' means a person transported, persuaded, induced, enticed, or coerced to engage in, or travel for the purpose of engaging in, a commercial sex act or prohibited sexual conduct, whether or not the person consented to the commercial sex act or prohibited sexual conduct. Accordingly, "victim" may include an undercover law enforcement officer.

20

twelve years" the base offense level should be "increase[d] by 4 levels."[9] Relying on *Root*, this Court held that an enhancement under § 2A3.1(b)(2)(A) was applicable. *Id.* at 1268-70. It explained that "whether a victim is fictitious is irrelevant to the application of a federal statute or sentencing guideline prohibiting sexual conduct with a minor." *Id.* at 1268.

Here, Mr. Vance used his superior knowledge and resources in an attempt to unduly influence the fictitious minors. He used his knowledge of computers and the internet to contact people whom he believed would supply minors for sexual conduct. He also used his financial resources to pay the feigned procurer to act as his agent in influencing the minors to satisfy his sexual desires.

Mr. Vance contends that § 2G1.3(b)(2)(B) is inapplicable to his conduct because he was not a direct participant in unduly influencing a minor to engage in prohibited sexual conduct. He argues that he "merely agreed, through a third party, to travel to Costa Rico to have illicit intercourse." We disagree. Mr. Vance participated in attempting to unduly influence a minor by employing "John" to supply minors to engage in sexually explicit conduct. The fact that an agent was used as an intermediary to effectuate Mr. Vance's influence over the minors supports the conclusion of undue influence. Mr. Vance used his superior

---

[9]The 2003 version of § 2A3.1 provided that: "'Victim' includes an undercover law enforcement officer."

21

knowledge and financial resources to out-source the task of asserting undue influence on a minor.

As this Court explained in *Lebovitz* and *Murrell*, in interpreting similar Guidelines sections, the focus is on the defendant's intent, not whether the victim is real or fictitious. *See Lebovitz*, 401 F.3d at 1269-70; *Murrell,* 368 F.3d at 1289. Here, the jury rejected Mr. Vance's defense and found that Mr. Vance intended to have sexual contact with real minors. The fact that the minors actually were fictitious does not change the applicability of the two-level enhancement pursuant to § 2G1.3(b)(2)(B). Accordingly, the District Court did not err in enhancing Mr. Vance's base offense level pursuant to U.S.S.G. § 2G1.3(b)(2)(B).

## C

Mr. Vance also maintains that the District Court erroneously applied the Sentencing Guidelines enhancement set forth in U.S.S.G. § 2G1.3(b)(3)(B) because the District Court erroneously determined that it applies to the use of a computer by an undercover officer to provide the recipients of his internet message with the opportunity of hiring him to procure minors for prohibited sexual conduct.

Pursuant to § 2G1.3(b)(3)(B), a District Court must apply a two-level increase to a defendant's base offense level "[i]f the offense involved the use of a computer or an interactive computer service to . . . entice, encourage, offer, or

22

solicit a person to engage in prohibited sexual conduct with the minor." Application Note 4 to § 2G1.3 explains that "[s]ubsection (b)(3) is intended to apply only to the use of a computer or interactive computer service to communicate directly with a minor or with a person who exercises custody, care, or supervisory control of the minor."

As discussed above, in *Murrell*, an undercover officer posed as the father of a thirteen-year-old girl whom he agreed to rent to Murrell for prohibited sexual conduct. 368 F.3d at 1284-85. In its sentencing decision, the District Court imposed a two-level enhancement, pursuant to § 2G1.1(b)(5), because Murrell communicated with the "father," by using a computer. *Id.* at 1285. This Court affirmed the enhancement, holding that, because Murrell used a computer to communicate with the "father" and Murrell likely believed that the "father" exercised control and authority over his minor daughter, the enhancement was proper under § 2G1.1(b)(5)(A) and its commentary. *Id.* at 1289-90.

In this matter, Mr. Vance used a computer to direct his agent to provide minor girls for illicit sexual conduct. Mr. Vance's argument that the enhancement is inapplicable in his case because he did not personally solicit the minors ignores the plain meaning of the language of § 2G1.3(b)(3)(B).

Here, as in other sting operations, Captain Crane, posing as "John," posted a message on a web site to provide sexual predators the opportunity to use "John" as their agent to provide minors for sexual activities. Mr. Vance took the opportunity provided by Captain Crane. These facts squarely fit into the plain language of § 2G1.3(b)(3)(B). The District Court found that Mr. Vance believed that "John" had supervisory control over the minors because Captain Crane represented that he "offer[ed] a variety of" underage girls and he would "line up the appropriate" girls and make them available for Mr. Vance upon arriving in Costa Rica. Accordingly, we conclude that the District Court did not err in applying a two-level enhancement, pursuant to § 2G1.3(b)(3)(B), to Mr. Vance's base offense level.

**AFFIRMED.**

24