[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 10, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-12921
Non-Argument Calendar

_____

D. C. Docket No. 06-00014-CR-5

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANKLIN LAMAR WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(January 10, 2008)**

Before ANDERSON, BIRCH  and HULL, Circuit Judges.

PER CURIAM:

Franklin Williams appeals his conviction and sentence for possession with the intent to distribute five grams or more of cocaine base ("Count 1"), and possession with intent to distribute fifty grams or more of cocaine base ("Count 2"), both in violation of 21 U.S.C. § 841(a)(1). He argues that: (1) the district court erred when it commented to the jury, after the government rested, that, at that time, the case "shifts to the defendant;" (2) there was insufficient evidence to support his convictions; and (3) the district court abused its discretion in denying his presentence motion for a psychiatric examination.[1] We AFFIRM.

## I. BACKGROUND

Williams, represented by trial counsel of his choice, James L. Hardin,[2] pled not guilty to each count of possession with intent to distribute cocaine base. Hardin filed numerous pretrial motions on Williams's behalf, but he never moved to have Williams psychologically examined.

At trial, the government called as its first witness DEA Agent Stephen

---

[1] Williams also argues that his trial counsel was ineffective for failing to have him psychologically evaluated prior to trial, or for failing to object to certain impeachment evidence presented by the government. However, we decline to consider Williams's ineffective assistance claims at this time, because the proper forum for him to raise these claims is in a motion brought under 28 U.S.C. § 2255. See Massaro v. United States, 538 U.S. 500, 504-06, 123 S.Ct. 1690, 1693-94 (2003); United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002).

[2] A magistrate judge initially appointed Hardin to represent Williams, apparently because the interests of justice so required, not be
cause Williams was indigent. R1-8; R1-69, Letter from Hardin to Carmen Rafter, 8 June 2007. Williams apparently thereafter hired Hardin to represent him because he did not want court-appointed counsel. R2 at 4.

Tinsley, who testified that he began investigating Williams after he received a telephone call from a local drug agent about Williams's purported involvement in distributing cocaine and other drugs. The local drug agent had learned of Williams through a confidential informant ("CI").

Tinsley testified that the CI, who was still cooperating with the government, made two controlled buys from Williams.[3] Tinsley testified that on 3 August 2006, the CI contacted Williams by telephone and set up a controlled purchase for later that day. Immediately prior to the controlled buy, Tinsley and other agents searched the CI and his vehicle, and determined that he did not have any cocaine or other drugs on him at the time. The agents wired the CI, handed him digital scales and $1,900 in marked bills, and instructed him to purchase two ounces of cocaine from Williams. The agents followed the CI to the prearranged meeting location, which was a residence in which Williams frequently slept, and they set up surveillance and observed the CI enter that residence.

Tinsley explained that the agents were unable to record the entire conversation between Williams and the CI, even though the CI was wired, because the tape ran out of space. Nevertheless, the agents were able to monitor the entire

---

[3]Before voir dire commenced, a government attorney informed the court and defense counsel that the CI had been hospitalized that morning, and that consequently, if the need arose, the government intended to play taped recordings of conversations between the CI and Williams.

conversation. Tinsley testified that, after the tape ran out, he overheard Williams and the CI discussing the weight of the cocaine as they were adding or removing amounts of cocaine from the digital scales in order to ensure that the CI received the correct quantity of cocaine.

Tinsley explained that the agents later observed the CI exit the residence and get into his car, and they followed him to a prearranged location. Once they arrived at the prearranged location, Tinsley observed the CI "immediately" hand the cocaine over to one of the other agents. R3 at 23. Tinsley testified that the CI was only able to purchase one ounce of cocaine, instead of the two ounces he was instructed to purchase. Accordingly, he was able to return $950 in marked bills to the agents. After that, the agents again searched the CI and his car, and determined that he did not have any other drugs on him.

As for the second purchase, Tinsley testified that the CI and Williams again spoke on the telephone and arranged a meeting to purchase two ounces of cocaine for 9 August 2006. Tinsley explained that, prior to the meeting, the agents followed the same procedures as before: they searched the CI and his automobile, wired him, and provided him with $1900 in marked bills. The CI, still under surveillance at the time, arrived at the prearranged meeting location, and spoke to Williams and others. Tinsley indicated that he overheard the CI and Williams

4

discussing the quantity of cocaine that the CI wanted to purchase and Williams informing the CI that he needed to pick up an individual named Harry Dixon to cook the powder cocaine into crack cocaine.

Tinsley testified that the tape used by the agents to record the second controlled buy ran out of space as well. After the second tape ran out, Tinsley overheard Williams, Dixon, and the CI cooking the cocaine and discussing its quality. After the controlled buy, Tinsley met with the CI at a predetermined location, the CI handed Tinsley the crack cocaine, and Tinsley searched the CI for any additional drugs.

Tinsley testified that he copied the tape recordings onto compact disks. The government later introduced these recordings into evidence, without objection. Tinsley also identified the transcripts of the tapes that he, another agent, and the CI had prepared, and he testified that: (a) the contents of the transcripts were accurate, to the best of his knowledge; (b) he was familiar with the CI's voice because he had worked with the CI on a number of occasions; (c) he was familiar with Williams's voice because he had overheard officers speaking with Williams during the execution of a search warrant, and he had personally spoken with Williams at various court proceedings; (d) he was "one hundred and ten percent" certain that he could recognize Williams's voice correctly; and (e) the transcripts

5

accurately identified the speakers on the tape. Id. at 33. The transcripts were then introduced, without objection, "only for the purposes of the record . . . and [for] the jury [to] be allowed to utilize [them]" as the tapes were played. Id. at 33-34. The district court provided a limiting instruction that the jury should decide for itself whether the transcripts accurately reflected the contents of the conversations and the identity of the speakers, and, if the transcripts did not, then the jury should disregard them to the extent they were inaccurate.

Before playing the recordings for the jury, Tinsley testified that, based on his training and experience as a DEA agent, he was familiar with drug lingo. He explained that the word "hard" referred to crack cocaine; the word "soft" referred to powder cocaine; and the phrase "oz" referred to ounces. Id. at 13. Tinsley also testified that the recordings being played at trial did not represent the complete recordings of the telephone conversations. The government then played the recordings for the jury, and Williams made no evidentiary objection.

In the first recorded conversation between the CI and Williams, which took place on 3 August 2006, the CI informed Williams that he wanted to purchase two ounces of the "hard brother," and Williams responded that "it" was "on the way." R.Exh -Tab 3 at 1-2.[4] In the second conversation between the CI and Williams,

_____

[4]For the sake of clarity and convenience, because the recordings were not taken down by the court reporter, we cite to the government's transcripts.

recorded that same day, the CI agreed to purchase from Williams two of "[i]t" for "19" – presumably referring to the purchase of two ounces of cocaine for $1900. R.Exh.-Tab 4 at 1. In the third conversation between the CI and Williams from 3 August, it is apparent that Williams thought that the CI wanted to purchase "some powder," but the CI reiterated that he wanted to purchase "the hard." R.Exh.-Tab 5 at 2. Williams also asserted that he could obtain some "hard," and the CI should "[c]ome on." Id. at 2-3. In the fourth recorded conversation between Williams, the CI, and two other males, Williams said he would only sell the CI "one" for "950" – presumably referring to one gram of cocaine for $950 – because Williams wanted the other "one." R.Exh.-Tab 6 at 2-3. Williams also stated that "[i]t was going to weigh 14 grams." Id. at 2.

In the fifth conversation between Williams and the CI, which was recorded on 8 August 2006, Williams informed the CI that he did not have a "cooking machine," but he could get someone to cook for $30.00. R.Exh.-Tab 7 at 1. In the sixth conversation between Williams and the CI, recorded on 9 August 2006, the CI arranged a meeting to purchase "two hard" from Williams. R.Exh.-Tab 8 at 1. In the final conversation between Williams, the CI, and an unidentified female named "Lisa," recorded on 9 August 2006, Williams said that he was getting a third-party to cook "it" because he knew that the CI wanted two ounces of "hard,"

7

and that the cooker charged $30.00 for his services. R.Exh.-Tab 9 at 1-2. Williams also responded affirmatively when the CI asked him if he had any "hard dope." Id. at 4.

After the recordings were played for the jury, Tinsley testified that Lisa Smitson, a/k/a Lisa Stanford, Williams's girlfriend, was the woman referred to as "Lisa" in one of the recordings. R3 at 47. On cross-examination, Tinsley admitted that no agent actually observed either of the drug transactions take place, but only heard Williams's voice on the recordings. On redirect, Tinsley testified, over defense counsel's objection, that agents executed a search warrant for the property where the drug transactions occurred and discovered approximately one ounce of marijuana and three handguns in that house. Tinsley also testified that the agents found Williams sitting on five grams of crack cocaine in a mobile home on the property.

The government's next witness, Megan Collier, testified that she worked as a manager of a Radio Shack store, and that Lisa Stanford purchased a cellular telephone from her store in June 2006. She also confirmed the number registered to that telephone, which was the same telephone number that the CI dialed when he set up the two controlled purchases from Williams. The government also called Jeanette Marie Perr, who was tendered, without objection, as an expert witness in

forensic chemistry. Perr testified that the substances that the CI handed over to Tinsley after the two controlled buys both tested positive for cocaine, and weighed 26.3 grams and 57.8 grams, respectively. Id. at 70.

Another government witness, Anthony Youmans, a local drug officer, testified that he was familiar with both the CI and Williams's voices, and he independently identified them as the two speakers on the recordings. On cross-examination, Youmans indicated that he had conversed with Williams on "several" occasions throughout a two-year period, but not more than nine times. Id. at 75.

The government also called as a witness Tracy Crosby, a local police sergeant, who testified that: (a) he was familiar with Williams and the CI; (b) he had heard Williams's voice on "a couple of occasions;" and (c) he had listened to the recordings; he then identified the voices in the recordings as those of Williams and the CI. Id. at 77. On cross-examination, Crosby stated that he had conversed with Williams "a couple" of times, and they had last spoken approximately seven to eight months previously. Id. at 78.

The government rested. At that point, the district court commented to the jury, "[W]e've reached the point in this case where the government has rested its case. That means that the government has presented all of its evidence in the case, with the exception of any rebuttal evidence that the government may use later in

the case. So at this time the case shifts to the defendant." Id. at 80. Williams did not object to this comment.

Williams then testified on his own behalf. Williams testified that he had been shot five times in the head in Vietnam, suffered from seizures and two heart attacks, was under the care of three psychiatrists, and was completely disabled. Williams also denied: (a) that he ever sold any narcotics; (b) that he dated Lisa Smitson; (c) that he knew the CI; (d) that it was his voice on the recordings; (e) that he had any recent dealings with Harold Dixon; and (f) that he had used anyone else's cellular phone but his wife's during August 2006.

On cross-examination, the government attempted to impeach Williams's testimony that he had never sold any narcotics or ever dated Smitson, and the following exchange occurred:

> Q.   Mr. Williams, I have just a couple of questions for you. You say you do know Lisa Stanford, who's also known as Lisa Smitson?
>
> A.   That's Mr. Joe Stanford's wife, and he live[s] out there [unintelligibly speaking] and he work[s] for me. That's that lady['s] husband.
>
> Q.   Is that the only way you know her, sir?
>
> A.   I'm 58, sir. I ain't no child.
>
> Q.   I know that, sir. In 1997, however, you were convicted of the felony offenses of possession with cocaine with intent to

10

> distribute, possession of marijuana with intent to distribute, sale of marijuana, and you were indicted with Lisa Stanford, also known as Lisa Smitson; do you remember that, sir?
>
> A.   [Unintelligibly speaking] I wasn't with her [unintelligibly speaking] those cases is pending right now.
>
> Q.   You admit, however, you are a convicted drug dealer?[5]
>
> A.   No, I ain't no drug dealer [unintelligibly speaking].

Id. at 88.  Because Williams tended to ramble in his responses, the district court at one point instructed his attorney to ensure that Williams responded to the actual questions asked.  The court reporter was also occasionally unable to transcribe portions of Williams's responses and so indicated that Williams was "unintelligibly speaking."  Id. at 83-88.

After both parties rested, the district court instructed the jury, inter alia, that "the defendant is presumed by the law to be innocent.  The law does not require a defendant to prove his innocence or to produce any evidence at all.  The government has the burden of proving a defendant guilty beyond a reasonable doubt, and if it fails to do so you must find the defendant not guilty."  Id. at 94.  The district court also instructed that the jury "should not assume from anything [the court] may have said that [it] ha[d] any opinion concerning any of the issues in

---

[5]The government did not introduce certified copies of these convictions into evidence. However, Williams's counsel did not object to the question.

11

this case. Except for [its] instructions . . . on the law, [the jury] should disregard anything [it] may have said during the trial in arriving at [its] own decision concerning the facts." Id. at 94-95. The jury ultimately convicted Williams on both counts. Williams timely moved for a new trial on numerous grounds, including that the verdicts were not supported by the evidence. The district court denied this motion without explanation.

Prior to Williams's sentencing, Hardin moved to withdraw from representation because Williams had hired another attorney to represent him during sentencing and on appeal. The magistrate judge granted Hardin's motion, and attorney Richard Darden filed a notice of appearance on Williams's behalf. A probation officer prepared a presentence investigation report ("PSI") for Williams's sentencing.

As to Williams's physical condition, the probation officer noted that although Williams indicated that he had been wounded on five occasions in Vietnam, the probation officer was unable to verify this statement from Williams's military service record. As to Williams's mental and emotional health, the probation officer asserted that Williams's medical records indicated that he had received counseling for post-traumatic stress disorder ("PTSD") by psychiatrists at two locations in Georgia and also at a Veterans Administration hospital, and that

12

he had been prescribed Seroquel and Trazodone to treat this condition. The probation officer also noted that Williams had indicated that he had consumed alcohol socially since the age of 19, and that a urine specimen collected during a medical examination in 2006 had tested positive for the presence of cocaine.

The probation officer indicated that with a total offense level of 36 and a criminal history category of V, Williams's sentencing range was 292 to 365 months. The probation officer further indicated that Count 1 carried a statutory mandatory minimum term of imprisonment of ten years, and a statutory maximum of life imprisonment, and Count 2 carried a statutory mandatory minimum of twenty years, and a statutory maximum of life imprisonment. Williams filed various objections to the PSI; the government filed none.

On the day before sentencing, Williams's replacement attorney, Darden, moved for a psychiatric evaluation of Williams. R1-61. Darden contended that Williams might not have been competent at the time of trial given that (1) he suffered from PTSD brought on by his service in Vietnam; (2) he was taking numerous medications, some of which are commonly used to treat psychological disorders as well as depression; and (3) he receives compensation from the Veterans Administration for total disability due to his PTSD. Darden also stated that, based on his observations of Williams during "several hours of personal

interviews" as well as reports of "[Williams's] demeanor during his trial," he personally believed that Williams might not be competent. Id. at 2.

At sentencing, the district court listened to Darden's arguments in support of his motion for a psychiatric examination of Williams: (a) Williams had been responding "inappropriate[ly]" to his questions, R4 at 5; (b) Williams's trial counsel had "readily admitted" to Darden that Williams was "bananas," id.; (c) Williams had "rambled" on the stand, id.; (d) Williams appeared now to be fixated on a prior state court conviction, and believed that the underlying federal charges stemmed from the fact that the county in which the state offense occurred "ha[d] some type of vendetta against him," id. at 6; and (e) Williams was on psychotropic medications, had been diagnosed with PTSD, and had been arrested approximately 40 times, all of which "r[ang] a bell in [Darden's] head that something may be wrong with [Williams]," id. at 7.

The district court ultimately denied the motion, stating that the record and arguments presented had raised no bona fide doubt that Williams was competent to proceed with sentencing. R4 at 10. The district court explained that: (a) although Williams asserted that he had been shot five times in Vietnam, his medical records did not confirm this, id. at 5; (b) many of the medications prescribed for Williams were used to treat depression, and that depression and mental incompetence were

"two entirely different things," id. at 6; (c) based on the recorded conversations, it appeared that Williams "knew exactly what he was doing; exactly what he wanted to do and exactly who he was dealing with in selling his drugs," id. at 7; (d) there was no evidence, outside of Darden's present argument, that suggested that Williams had a history of mental illness, or that he was unable to consult with his attorney or to understand rationally the proceedings against him, id. at 8-9; and (e) the court had personally observed Williams during his trial, and had listened to his testimony, and there was nothing there to raise a bona fide doubt regarding Williams's competency, id. at 9. The district court sentenced Williams to 292 months on each count, to run concurrently.

## II. DISCUSSION

### A. Court's Comment

We ordinarily review a district court's comment on trial evidence for an abuse of discretion. See, e.g., United States v. Berdick, 555 F.2d 1329, 1330 (5th Cir. 1977) (per curiam). However, when a defendant has failed to object before the district court, our review is for plain error only. United States v. Vance, 494 F.3d 985, 993 (11th Cir. 2007). To prevail under the plain error standard, an appellant bears the burden of demonstrating that (1) the district court plainly erred, and (2) the error implicated his substantial rights. Id. We may then correct the error, at

15

our discretion, if the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." Id.

In a criminal trial, the government, not the defendant, carries the burden of proving all elements of an offense beyond a reasonable doubt. See Sullivan v. Louisiana, 508 U.S. 275, 277-78, 113 S. Ct. 2078, 2080 (1993). Finally, we presume that a jury will follow its instructions. United States v. Kennard, 472 F.3d 851, 858 (11th Cir. 2006), cert. denied, 127 S. Ct. 3004 (2007).

Upon review of the record, and upon consideration of the briefs of the parties, we conclude that the district court did not plainly err in commenting to the jury, at the close of the government's case-in-chief, that "at this time the case shifts to the defendant." R3 at 80. In context, no reasonable juror could have construed this statement to mean that the burden of proof was shifting to Williams. However, even if a juror could have been confused, Williams still cannot demonstrate that his substantial rights were affected by the comment. The court cleared up any potential ambiguity as to the statement by instructing the jury at the close of all of the evidence that, in arriving at a decision, it should disregard any comments made by the court during the course of the trial, and that: (a) Williams was presumed to be innocent; (b) the law did not require Williams to prove his innocence or to produce any evidence at all; and (c) the government carried the burden of proving

16

Williams's guilt beyond a reasonable doubt, and its failure to do so required that the jury find him not guilty. We presume that the jury followed these instructions. See Kennard, 472 F.3d at 858. Accordingly, Williams has not demonstrated that the court's comment, even if made in error, amounted to plain error.

B. Sufficiency of Evidence

We review de novo the sufficiency of the evidence supporting a criminal conviction. United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005). All evidence must be viewed "in the light most favorable to the government," and we "draw[] all reasonable inferences and mak[e] all credibility choices in the government's favor." Id. We will not reverse a conviction based on insufficient evidence unless "no reasonable trier of fact could have found [the defendant] guilty beyond a reasonable doubt." United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004) (per curiam).

To obtain a conviction under 21 U.S.C. § 841(a)(1), the government must establish the existence of three elements: (1) possession of a controlled substance, (2) knowledge of that possession, and (3) intent to distribute the substance. United States v. Wilson, 183 F.3d 1291, 1299 n.13 (11th Cir. 1999). To prove a defendant's involvement in a particular offense, the government may rely, in part, on a witness's identification of the defendant's voice on an incriminating tape

recording, so long as that witness was familiar with the defendant's voice.

See, e.g., United States v. Green, 40 F.3d 1167, 1173 (11th Cir. 1994).

With respect to the first element of an § 841(a)(1) offense, the government presented testimony that the substances that the CI handed over to Agent Tinsley after the two controlled buys both tested positive for cocaine, and weighed 26.3 grams and 57.8 grams, respectively. As to the second and third elements of an § 841(a)(1) offense, the government presented the testimony of Agent Tinsley that a government informant contacted Williams by telephone on two different occasions to set up controlled buys of cocaine. Agents searched the CI before both transactions to ensure that he did not have any drugs on him, and observed him enter into a house where the controlled buys were to occur. Agents also observed the CI exit the house after the controlled buys had taken place, and they followed him to a prearranged location, where the CI handed to them one gram of cocaine on one occasion, and two grams of cocaine on the other occasion.

Additionally, the testimony at trial revealed that the CI was wired during these transactions, and the government introduced into evidence these secretly recorded incriminating conversations between the CI and a male who sold the crack cocaine to the CI. The government also presented the testimony of three agents, all of whom testified that they were familiar with the voices of both the CI

and Williams, and each of whom independently identified the voice of the male who sold the crack to the CI as that of Williams.  We also observe that because Williams testified in his own defense, the jurors were able themselves to compare his voice to that of the individual on the recordings who supplied the CI with the cocaine.  Moreover, the government presented evidence that officers found Williams sitting on five grams of crack cocaine during the execution of a search warrant.

Viewed in a light most favorable to the government, all of this evidence was sufficient for a reasonable fact finder to conclude that Williams was guilty beyond a reasonable doubt of the offense conduct.  Therefore, the evidence was sufficient to sustain Williams's convictions.  See Gunn, 369 F.3d at 1234.

C. Presentence Psychiatric Examination

We review the denial of a motion for a presentence psychiatric examination for an abuse of discretion.  United States v. Nickels, 324 F.3d 1250, 1251 (11th Cir. 2003) (per curiam) (reviewing motions brought pursuant to 18 U.S.C. §§ 3552(c), 4241(a)).  Under this standard, "a district court has a range of choice, and so long as its decision does not amount to a clear error of judgment we will not reverse even if we would have gone the other way had the choice been ours to make." United States v. Campbell, 491 F.3d 1306, 1310 (11th Cir. 2007)

19

(quotation and alteration omitted).  A district court may rule on a motion for a competency exam "without [the] benefit of a full dress hearing as long as the court has no 'bona fide doubt' as to the competence of the defendant."  See Nickels, 32 F.3d at 1252 (quoting United States v. Cruz, 805 F.2d 1464, 1479 (11th Cir. 1986)).  The term "bona fide doubt" comes from an Illinois statute considered by the Supreme Court in Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836 (1966), and we have adopted that standard "because it is no less helpful than any other standard."  Zapata v. Estelle, 588 F.2d 1017, 1020 n.1 (5th Cir. 1979).  We have said that "three factors are to be considered in determining [whether a bona fide doubt has been raised as to competency]: any history of irrational behavior, defendant's trial demeanor, and prior medical opinion."  Id. at 1020.  "[R]epresentations [by defense counsel] concerning the competence of his client . . . [are also] unquestionably a factor which should be considered" in deciding whether a defendant's competence requires further examination.  Drope v. Missouri, 420 U.S. 162, 178 n.13, 95 S.Ct. 896, 907 n.13 (1975).  Finally, "[t]he legal test for competency is whether the defendant had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he had a rational as well as factual understanding of the proceedings against him."  Nickels, 32 F.3d at 1252 (internal quotation marks and citations

20

omitted).

In looking at the relevant factors, we first observe that, although the probation office's presentence investigation and Williams's testimony both confirm that Williams suffered from post-traumatic stress disorder, and was treated and counseled for it by psychiatrists in Waycross and Brunswick, Georgia, and at the Lake City Veterans Administration Medical Center, the record includes no medical report or other prior medical opinion indicating that either the condition or the treatment thereof has affected Williams's competency to stand trial in any way. Second, although Williams's replacement attorney states that his personal interactions with Williams have caused him to suspect that "something may be wrong with [Williams]" and that Williams's original trial counsel had "admitted" that Williams was "bananas," and although he points out that Williams has "been arrested something like 40 times," R4 at 5, 7, there is no other source of evidence in the record that Williams behaved *irrationally* on the occasion of any of these other arrests or at any other point. In his consideration of the issue of any history of irrational behavior, the district court pointed out that the tape recorded conversations played at trial gave him the impression that Williams "knew exactly what he was doing; exactly what he wanted to do and exactly who he was dealing with in selling his drugs." Id. at 7. Finally, as to Williams's demeanor at trial, the

court also pointed out that it had "witnessed the defendant during the trial," " heard the defendant's testimony," and that "nothing that [he] saw during the trial led [him] to think that [Williams] was suffering from any inability to consult with his lawyer, or to understand the proceedings against him, [or raised], in [the district court's] mind, a bona fide doubt regarding [Williams's] competence." Id. at 9.

In denying the motion for a competency evaluation, the district court acknowledged the arguments and assertions of Williams's replacement attorney, recited the proper legal standard, and considered each factor relevant thereto. The court, after emphasizing that there was "no evidence before [the court], outside of [the attorney's] arguments [that day], that [Williams] ha[d] a history of mental illness," id. at 8, then weighed the new attorney's reported observations and interactions with Williams against his own observations and interactions with Williams during the trial. We do not find his conclusion, that the record raised no bona fide doubt as to Williams's competency, to fall outside the range of possible conclusions given our own review of the record. Accordingly, we find no abuse of discretion.

### III. CONCLUSION

Williams appeals his convictions and sentence for possession with the intent to distribute cocaine. Because we find that his substantial rights were unaffected

by any possible error in the court's comment to the jury, and that there was sufficient evidence to support his convictions, we **AFFIRM** Williams's convictions. Finding no abuse of discretion in the district court's denial of Williams's motion for a presentence psychiatric examination, we also **AFFIRM** his sentence.

**AFFIRMED.**