**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee*,

v.

CHARLES C. LYNCH,
  *Defendant-Appellant.*

No. 10-50219

D.C. No.
2:07-cr-00689-GW-1

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant*,

v.

CHARLES C. LYNCH,
  *Defendant-Appellee.*

No. 10-50264

D.C. No.
2:07-cr-00689-GW-1

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted April 13, 2018
Pasadena, California

Filed September 13, 2018

Before:  John M. Rogers,* Jay S. Bybee,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Rogers;
Dissent by Judge Watford

## SUMMARY**

### Criminal Law

The panel (1) affirmed Charles Lynch's conviction for conspiracy to manufacture, possess, and distribute marijuana, as well as other charges related to his ownership of a marijuana dispensary in Morro Bay, California; (2) on the government's cross-appeal, remanded for resentencing; and (3) instructed the district court on remand to make a factual determination as to whether Lynch's activities were in compliance with state law.

The panel held that the district court's exclusion of testimony from a lawyer about Lynch's phone call to the DEA, as well as a recording of this lawyer discussing that call on a radio program, was correct because both pieces of evidence were hearsay to which no exception applied.

---

* The Honorable John M. Rogers, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not abuse its discretion in excluding repetitive and irrelevant evidence about Lynch's compliance with local laws.

The panel held that evidence of a dispensary employee's marijuana sale to a government agent was not more prejudicial than probative, and was generally harmless given Lynch's concession of factual guilt.  The panel held that the district court correctly excluded as hearsay a statement the employee made to an investigator that Lynch "didn't know anything about this deal."

The panel held that there was no error in the district court's handling of a number of pieces of evidence that Lynch contends were impermissibly inflammatory, and that any would be harmless.

The panel rejected Lynch's claim that evidence he subsequently discovered about the United States' prosecution priorities should have been disclosed to him pursuant to *Brady v. Maryland*.  The panel held that the evidence was not exculpatory of Lynch or otherwise relevant to his case.

The panel held that because Lynch did not show facts providing a basis on which a reasonable jury could find that he was entitled to the defense of entrapment by estoppel, he was not entitled to present that defense in the first place, and the district court did not err in any decisions it made with respect to it.

The panel held that the district court did not commit any error by warning during voir dire against jury nullification. The panel held that the admonition was an appropriate exercise of a district court's duty to ensure that a jury follows

the law, and was additionally justifiable given that the need for the warning was a risk that Lynch's counsel had invited.

The panel held that the district court did not abuse its discretion in not allowing him to inform the jury of the mandatory minimum sentence that he faced if convicted.

The panel rejected the Lynch's challenges to the district court's handling of jury communications because the district court did not actually permit any ex parte communications and the other limitations were reasonable exercises of a district court's power to manage its trial proceedings.

On the government's cross-appeal, the panel held that the district court erred in not applying the five-year mandatory-minimum sentence under 21 U.S.C. § 841(b)(1)(B)(viii) on the ground that Lynch was eligible for the safety valve set forth in 18 U.S.C. § 3553(f). The panel held that Lynch was not eligible for the safety valve, given his role leading the dispensary, an organization involving more than five participants; and that Lynch was therefore required to be sentenced to the five-year mandatory minimum. The panel rejected the government's request that the case be reassigned to another district judge on remand.

The panel did not need to reach the question of whether a congressional appropriations rider (enacted following the filing of this appeal), which this court has interpreted to prohibit the federal prosecution of persons for activities compliant with state medical marijuana laws, operates to annul a properly obtained conviction. The panel explained that a genuine dispute exists as to whether Lynch's activities were actually legal under California state law, and therefore remanded to the district court for a factual determination as to state-law compliance.

Dissenting, Judge Watford would reverse and remand for a new trial because, in his view, in trying to dissuade the jury from engaging in nullification, the district court violated Lynch's constitutional right to trial by jury, and the government can't show that this error was harmless beyond a reasonable doubt.

## COUNSEL

Alexandra Wallace Yates (argued), Deputy Federal Public Defender; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Defendant-Appellant.

David P. Kowal (argued), Assistant United States Attorney; Robert E. Dugdale, Chief, Criminal Division; André Birotte Jr., United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

Joseph D. Elford, Americans for Safe Access, Oakland, California, for Amicus Curiae Americans for Safe Access.

Jenny E. Carroll, Professor of Law, Seton Hall University, Newark, New Jersey, for Amici Curiae Criminal Procedure Professors.

Paula M. Mitchell, Reed Smith LLP, Los Angeles, California, for Amici Curiae Members of Congress.

Michael V. Schafler, Benjamin B. Au, Arwen R. Johnson, and Isabel Bussarakum, Caldwell Leslie & Proctor PC, Los Angeles, California, for Amici Curiae Senators Mark Leno and Mike McGuire, and Former Senator Darrell Steinberg.

## OPINION

ROGERS, Circuit Judge:

## I. Introduction

Charles Lynch ran a marijuana dispensary in Morro Bay, California, in violation of federal law. He was convicted of conspiracy to manufacture, possess, and distribute marijuana, as well as other charges related to his ownership of the dispensary. In this appeal, Lynch contends that the district court made various errors regarding Lynch's defense of entrapment by estoppel, improperly warned jurors against nullification, and allowed the prosecutors to introduce various evidence tying Lynch to the dispensary's activities, while excluding allegedly exculpatory evidence offered by Lynch. However, Lynch suffered no wrongful impairment of his entrapment by estoppel defense, the anti-nullification warning was not coercive, and the district court's evidentiary rulings were correct in light of the purposes for which the evidence was tendered. A remand for resentencing is required, though, on the government's cross-appeal of the district court's refusal to apply a five-year mandatory minimum sentence, which unavoidably applies to Lynch.

Following the filing of this appeal and after the submission of the government's brief, the United States Congress enacted an appropriations provision, which this court has interpreted to prohibit the federal prosecution of persons for activities compliant with state medical marijuana laws. Lynch contends that this provision therefore prohibits the United States from continuing to defend Lynch's conviction. We need not reach the question of whether the provision operates to annul a properly obtained conviction, however, because a genuine dispute exists as to whether Lynch's activities were actually legal under California state

law. Remand will permit the district court to make findings regarding whether Lynch complied with state law.

## II. Background

The facts of this case are largely unchallenged on appeal. In 2005 and into early 2006, Charles Lynch operated a marijuana store in Atascadero, California, before neighbor complaints caused the town to shut down Lynch's operations. In 2006 Lynch moved his activities to Morro Bay, opening what he called Central Coast Compassionate Caregivers (CCCC) in April of that year. Lynch's dispensary proved to be a popular one, employing around 10 subordinates and selling $2.1 million in marijuana and marijuana-related products during the period in which the dispensary operated.

Lynch's dispensary soon also attracted the attention of federal authorities. In March 2007, the DEA obtained a search warrant and raided Lynch's home, along with the dispensary. Lynch continued to operate CCCC, but his efforts there were short-lived. On July 13, 2007, the United States indicted Lynch on five counts: conspiracy to manufacture, possess, and distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846, 856, and 859 (Count 1); aiding the distribution of marijuana to persons below 21 years, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 859(a) (Counts 2 and 3); marijuana possession with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) (Count 4); and maintenance of a drug-involved premise, in violation of 21 U.S.C. § 856(a)(1) (Count 5). Lynch went to trial, took the stand, and admitted what he now concedes were "sufficient facts to find him guilty of the five counts charged." The jury convicted Lynch on all counts.

Lynch's arguments on appeal largely depend on legal developments beginning over a decade before CCCC opened its doors. In 1996, California voters decriminalized the use of marijuana for medical purposes. *See* Cal. Prop. 215, codified at Cal. Health & Safety Code § 11362.5. The U.S. Supreme Court subsequently held that Congress's determination that marijuana was a Schedule I substance under the Controlled Substances Act meant that marijuana had no medical value, *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 491 (2001), and that federal prohibition of and prosecution for marijuana-related activities remained permissible. *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). Lynch maintained a somewhat different view of the Controlled Substances Act from that of the Supreme Court, however. Lynch testified at trial that he had thought, based on the Tenth Amendment, that the 1996 referendum had overridden federal law, and thus made medical marijuana legal in California.

In accordance with this belief, Lynch claims that before opening CCCC, he had called the DEA, and reached a man, whose name or position Lynch did not know. Lynch stated that he had inquired of this person "what you guys are going to do about all of these medical marijuana dispensaries around the State of California." Lynch testified that the person responded that "it was up to the cities and counties to decide how they wanted to handle the matter." Lynch then allegedly also told the man that he intended to open a dispensary, to which the man is alleged to have repeated what he had told Lynch before, that it was "up to the cities and counties to decide."

This alleged advice did not turn out to be accurate, however. Lynch was indicted and scheduled for trial in the Central District of California. Several of the district court's

actions before and during trial remain the subject of dispute in this appeal.  At voir dire, the district court responded to a potential juror's invocation of jury nullification with a caution to the voir dire panel that "[n]ullification is by definition a violation of the juror's oath" and that, if selected as a juror, "you cannot substitute your sense of justice, whatever it may be, for your duty to follow the law, whether you agree with the law or not."  Then, in its rulings in motions in limine and at trial, the district court permitted various evidence that Lynch contends should have been excluded as impermissibly inflammatory, and also excluded evidence that Lynch contends should have been allowed to support Lynch's defenses.  Finally, Lynch alleges that the district court engaged in improper ex parte communications with the jury, and also did not disclose the contents of these communications to Lynch.

At trial, Lynch took the stand in his own defense, and, although forcefully defending his position that the DEA call had led him to believe that his activities were permitted, he also conceded facts sufficient to ensure his conviction if that defense failed.  Lynch therefore requested that that the court give an instruction on entrapment by estoppel.  The district court allowed an instruction on this defense with regard to counts 1, 4, and 5—general distribution, possession with intent to distribute, and maintaining a drug-involved premises—but refused to allow this defense as against counts 2 and 3, the distribution to minors charges, because the district court determined that Lynch's facts, even if believed, did not suffice to allow the defense as against those charges.

After a day of deliberation, the jury convicted Lynch on all counts.  Lynch filed several post-conviction motions for a new trial, including, as relevant here, a fourth new-trial

motion claiming a *Brady* violation.  This motion stated that a prosecutor post-trial had said that the office focused its resources on targeting those marijuana dispensaries "that more clearly violated state law," and Lynch contended that this statement was exculpatory of him.  The district court denied this and the other new-trial motions, however.

Following Lynch's conviction and after the failure of his new-trial motions, Lynch faced two possible mandatory-minimum sentences: a one-year mandatory minimum for distribution to persons under the age of 21, *see* 21 U.S.C. § 859(a), and a five-year mandatory minimum for the total amount of marijuana in his conspiracy, *see* 21 U.S.C. § 841(b)(1)(B)(vii).  Following a lengthy sentencing process, the district court held that Lynch was not subject to the five-year minimum because, the court held, it had discretion under the so-called "safety valve," 18 U.S.C. § 3553(f), not to apply this sentence to Lynch.  The court determined that the safety valve could not apply to Lynch's § 859(a) sentence, however, and so it sentenced Lynch to one year and one day in prison, suspended pending this appeal.

Lynch subsequently filed this timely appeal, challenging his conviction and objecting to the application of the one-year mandatory minimum.  The government also cross-appeals, arguing for imposition of the five-year mandatory minimum.

Subsequent to Lynch's conviction, and while this appeal was pending, Congress passed an appropriations measure, which, as relevant here, states that "None of the funds made available in this Act to the Department of Justice may be used, with respect to," among others, California, "to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of

medical marijuana." Consolidated and Further Continuing Appropriations Act of 2015 § 538, Pub. L. No. 113-235, 128 Stat 2130. Lynch filed a motion, claiming that the spending provision bars the government from continuing with this appeal. After a ruling by a Motions Panel of this court, and a refusal of the district court to rule on the issue while the appeal was pending, we allowed Lynch to submit these arguments as part of his third cross-appeal brief. Lynch also requested that the district court grant a hearing on whether Lynch was covered by the rider, but the district declined to do so, because Lynch's case was on appeal.

## III.

### A. Evidentiary Rulings

Lynch argues that there was error in three lines of evidentiary rulings made by the district court, but none of the alleged rulings was reversible error.

### 1. Exclusion of Lawyer Testimony and Recording

Lynch objects to exclusion of testimony from a lawyer about Lynch's phone call to the DEA, as well as a recording of this lawyer discussing that call on a radio program. Lynch had sought to substantiate his entrapment by estoppel defense by having this lawyer testify that, in January 2006, Lynch had told the lawyer about the substance of Lynch's alleged phone call to the DEA. Lynch also proposed to introduce a subsequent recording of a radio interview of the lawyer recounting Lynch's description of the call. The district court did not permit the lawyer to testify about Lynch's statements to him, however, because the district court reasoned that the lawyer's statement would be hearsay, and the testimony was also not admissible as a prior consistent statement of Lynch's, because any statement

Lynch made to the lawyer would have postdated Lynch's motivation to fabricate the contents of that call. The court also excluded the radio recording on those same hearsay grounds.

The district court's rejection of these pieces of evidence was correct because both pieces of evidence were hearsay to which no exception applied. In both cases Lynch sought to introduce the evidence for the same purpose: Lynch allegedly told the lawyer that the DEA had told Lynch that CCCC would be legal if operated in accordance with state law, and Lynch sought to have the lawyer testify or play the recording to support the notion that the DEA had told Lynch this. The evidence was thus clearly hearsay—and obviously excludable—because it was an out-of-court statement offered for the truth of the matter asserted, *i.e.*, that the government agent had told Lynch this. *See* Fed. R. Evid. 801(c).

Lynch nevertheless sought to permit the evidence's introduction as a prior consistent statement of Lynch's trial testimony regarding what the DEA had told him, *see* Fed. R. Evid. 801(d)(1)(B), but neither the lawyer's testimony nor the recording was admissible as a prior consistent statement. To be a prior consistent statement, a statement must occur before a motivation to fabricate arises. *Tome v. United States*, 513 U.S. 150, 156 (1995); *see also United States v. Bao*, 189 F.3d 860, 864 (9th Cir. 1999) (same). Here, however, the district court correctly determined that Lynch's motivations to fabricate predated any contact he had with the lawyer. At the time he made his alleged statements to the lawyer, Lynch was running a marijuana store in Atascadero, and was also deep in plans to open CCCC. In both cases, Lynch would have been strongly incentivized to make up or misrepresent the call—directly in exculpating his work in

Atascadero, and prospectively for when he began operations at CCCC. Anything Lynch told the lawyer therefore did not rebut the government's attack on Lynch's trial testimony, that Lynch fabricated or selectively remembered the contents of the DEA call, because Lynch's prior statement was subject to the same incentives for untruthfulness.

Lynch contends that his statements to the lawyer predated any motivation to fabricate, because Lynch had not yet begun operations at CCCC at the time he spoke to the lawyer. This argument takes too narrow a view of what constitutes a motivation to fabricate, however. This court has explained that a motivation to fabricate exists when such statements are inherently "self-serving;" for example, where a person was under investigation, even though not yet formally charged. *United States v. Miller*, 874 F.2d 1255, 1274 (9th Cir. 1989). That Lynch had not yet opened CCCC at the time he spoke to the lawyer did not keep his statements from being self-serving, most obviously because they planted the seeds for a defense against the obvious threat of prosecution for Lynch's intended future activities. An alibi surely does not become a prior consistent statement, just because it is proffered before a crime occurs. For instance, the Eleventh Circuit has held that a statement of innocent purpose was not admissible as a prior consistent statement because the defendant was in plans to commit the crime at the time of the statement. *See United States v. Vance*, 494 F.3d 985, 994 (11th Cir. 2007), *superseded by regulation on other grounds as recognized in United States v. Jerchower*, 631 F.3d 1181, 1186 (11th Cir. 2011).

Lynch also argues that the lawyer's testimony and the recorded radio interview should have been allowed to enhance Lynch's credibility as a witness, but this was not a permissible basis for admitting that evidence. "Prior

consistent statements by a witness 'may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited.'" *United States v. Collicott*, 92 F.3d 973, 979 (9th Cir. 1996) (quoting *Tome*, 513 U.S. at 157). Rather, as we have explained, such statements are allowable only to rebut claims of recent fabrication or improper motive. *Id.* Because Lynch's motivation remained the same from when he made the statements to the lawyer to his testimony at trial—being able to claim authorization for CCCC's activities—the fact that Lynch has consistently told the same story was not ultimately probative of his veracity. The district court therefore did not err in excluding this testimony.

### 2. Exclusion of Compliance with Local Laws

Lynch also argues that the district court erred in excluding evidence Lynch sought to offer about his adherence to Morro Bay local rules, as well as statements made by local authorities to Lynch about the permissibility of this operation. This exclusion fell well within a district court's substantial discretion to exclude improper defense evidence, *see Holmes v. South Carolina*, 547 U.S. 319, 326–27 (2006), because the evidence was both repetitive and irrelevant.

Lynch contends that the district court erred in allegedly preventing him from showing that he complied with local regulations, but the district court did not so limit Lynch's defense. In fact, the district court allowed Lynch substantial opportunity to present evidence about how he followed what Morro Bay required of him, including testimony to this effect from the mayor and city attorney. Lynch contends that the district court erred in not allowing him to present further evidence about CCCC's attempts to follow local and state law, but Lynch did not have an unlimited right to such a

presentation. Even acknowledging a defendant's right to choose his defense, exclusion for repetitiveness falls within a district court's discretion. *See United States v. Scholl*, 166 F.3d 964, 973–74 (9th Cir. 1999). Here, the district court declined to allow further testimony from the mayor and city attorney on the grounds that there was no dispute about Lynch's compliance with state and local law and that the additional proposed evidence suffered from additional deficiencies, such as being hearsay. The district court therefore did not abuse its discretion in excluding this evidence, because it clearly had the power to decline to allow otherwise-problematic evidence on an already-established and uncontested matter.

Lynch also contends that that the district court erred in excluding video evidence of a local sheriff stating that Lynch was welcome to reopen CCCC following the March 2007 raid, because, according to Lynch, this video was useful for Lynch's entrapment by estoppel defense. But the district court correctly rejected this evidence as irrelevant to Lynch's defense. Compliance with local law is not a substantive defense to a violation of federal drug law. *See Raich*, 545 U.S. at 29. In addition, as the district court determined, although approval from state and local authorities was neither necessary nor sufficient to demonstrate entrapment by estoppel, Lynch had already offered extensive evidence to that point. The district court therefore did not abuse its discretion in excluding the video, because it was repetitive of evidence already received, and not otherwise relevant to Lynch's defense.

### 3. Baxter Deal

Lynch also argues that it was error to permit the government's introduction of evidence that a CCCC employee, Abraham Baxter, sold $3,200 worth of marijuana

to a government agent, a transaction that Lynch alleges he did not know about and was not involved in. Lynch claims the evidence was unfairly prejudicial, in violation of Fed. R. Evid. 403. The evidence was not more prejudicial than probative, however, and the evidence was also more generally harmless, given Lynch's own concession of factual guilt.

The evidence was not improperly prejudicial, because its tendency was to prove the nature of the conspiracy of which Lynch was charged with being a part. On the government's theory of the case, Lynch joined with Baxter and the other CCCC employees to distribute marijuana, and Baxter's sale of the marijuana to the agent was part of this conspiracy. (Indeed, the indictment identified this sale as an overt act of the conspiracy involving Lynch.) A significant amount of evidence did exist on which a jury could find that Lynch was linked to this transaction or that the sale was foreseeable to him. That Lynch might not have known about Baxter's transaction does not necessarily render the evidence inadmissible, since, under *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946), coconspirators are "criminally liable for reasonably foreseeable overt acts committed by others in furtherance of the conspiracy they have joined, whether they were aware of them or not." *United States v. Gadson*, 763 F.3d 1189, 1214 (9th Cir. 2014) (quoting *United States v. Hernandez-Orellana*, 539 F.3d 994, 1007 (9th Cir. 2008)). Although the district court later stated in its sentencing memorandum that it did not believe that the government had proven Lynch's actual knowledge of this transaction, that does not bear on the question of exclusion, because determining the nature or scope of a conspiracy "is a question of fact, not of law, to be determined by the jury."

*United States v. DiCesare*, 765 F.2d 890, 900 (9th Cir. 1985), amended, 777 F.2d 543 (9th Cir. 1985).[1]

In any event, any complaints Lynch might have about the district court's treatment of the Baxter deal amount at most to harmless error. Lynch acknowledges that, when on the stand, he conceded sufficient facts to allow the jury to find him guilty of all charges. This fact severely limits Lynch's ability to complain of purported errors with regard to evidence introduced at his trial. "[I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Hasting*, 461 U.S. 499, 509 (1983). Alleged errors are not reversible if, setting that evidence aside, it is still "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." *Id.* at 511. Here, a jury would have convicted Lynch regardless of any treatment of the Baxter evidence, given that Lynch himself gave the jury all the necessary material to allow for his conviction. Lynch's complaints about the district court's handling of the Baxter-related evidence show therefore, at most, harmless error.

---

[1] Lynch also argues that the district court had expressed concern about the foundation of this evidence, and contends that the district court had stated it would offer a limiting instruction or declare a mistrial if the government did not prove that Lynch knew about Baxter's activities, but this argument is not supported by the record. What the district court stated would justify a limiting instruction or mistrial was the use of hearsay statements by Baxter as a coconspirator admission without the government's having laid the foundation for those statements. The district court never stated that evidence about the Baxter transaction would be subject to a blanket limiting instruction if the government failed to prove Lynch's actual knowledge of that transaction, and appropriately so, because such knowledge was not necessary for the government to have offered evidence that the transaction had occurred.

Lynch also objects to the exclusion of a statement Baxter had made to an investigator, that "Charlie didn't know anything about this deal," but the district court correctly excluded this evidence as hearsay. Lynch contends that this statement was nevertheless admissible as a statement against interest, *see* Fed. R. Evid. 804(b)(3), but the district court correctly held that statement was not allowable under that exception. To be a statement against interest requires, among other things, that "the statement so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true." *United States v. Paguio*, 114 F.3d 928, 932 (9th Cir. 1997). Stating the negative, that another person does not know about a crime, hardly inculpates the declarer, and certainly neither "so far" nor so clearly that a reasonable person would not say so if the statement were false. *Id.* Lynch takes the position that, because Baxter was under investigation when he made that statement, it might have been prejudicial to him in unforeseen ways, but this is exactly the sort of "mere[] speculation" that cannot serve as the basis for categorization as a statement against interest. *United States v. Monaco*, 735 F.2d 1173, 1176 (9th Cir. 1984). The district court therefore did not err in disallowing the introduction of this statement.

### 4. Other Alleged Inflammatory Evidence

Lynch also objects to the admission of a number of pieces of evidence that he contends should have been excluded as impermissibly inflammatory, but there was no error in the district court's handling of this evidence, and, even were we to find error, we would consider such error harmless. Lynch claims that it was wrong to allow testimony by law enforcement about Baxter-like distributions by other

CCCC employees outside the clinic, that evidence was introduced that a CCCC employee apparently mailed a package of marijuana, that the government showed surveillance videos that included "teenagers who looked healthy," that the government discussed the violent-sounding "AK47" strains of marijuana, and that the government showed a chart with the "type[s] of highs" caused by different marijuana strains. None of this evidence comes remotely close to what this court has identified as inappropriately inflammatory, like a defendant's reading of material advocating terrorism, *United States v. Waters*, 627 F.3d 345, 355 (9th Cir. 2010), or the imputation of guilt based on ethnicity, *United States v. Cabrera*, 222 F.3d 590, 596 (9th Cir. 2000). This evidence was also inconsequential in light of Lynch's own concession of guilt.

Lynch further argues that the district court should not have permitted admission of a CCCC business check written by Lynch to himself. The introduction of the check is also at most harmless error, because the evidence was not responsible for Lynch's ultimate conviction. In any event, the check was correctly admitted to show that Lynch controlled CCCC's accounts, and the district took appropriate steps, including redaction of the amount of the check, to avoid any unnecessary prejudice against Lynch.

## B. Nondisclosure of Reuther-Related Evidence

Lynch asserts that evidence he has subsequently discovered about the United States' prosecution priorities should have been disclosed to him pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). This claim is without merit, because the evidence was not exculpatory of Lynch or otherwise relevant to his case. As relevant here, Lynch's fourth new trial motion included a claim based on a statement made on March 27, 2009, by one of Lynch's

prosecutors. In the context of explaining a new Department of Justice policy discouraging medical marijuana prosecutions for facilities in compliance with state law, that prosecutor stated: "in this district we had already made the determination that in allocating our resources we would focus on those [medical marijuana facilities] that more clearly violated state law. So the attorney general's statement really for us has always been somewhat of a red herring . . . those were always factors in the investigation at the beginning." Lynch contended that this testimony demonstrated that the government possessed undisclosed exculpatory information, in that the prosecutor's statement allegedly contradicted trial testimony from a DEA agent that DEA "would be investigating the federal laws and the marijuana—illegal sales of marijuana federally. It doesn't matter what the state or local officials say or do." Lynch therefore argued that he was entitled to a new trial because the government had failed to comply with its *Brady* obligations. The court denied Lynch's new trial motion, however, because this evidence was not exculpatory of Lynch.

The district court was correct in rejecting Lynch's argument that this statement proved the existence of a *Brady* violation. To justify reversal for nondisclosure, evidence must be of the sort that, if it had "been disclosed to the defense, the result of the proceeding would have been different." *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The obvious point that the government prioritizes its resources on prosecuting those most flagrant offenders should not have been a surprising fact, and certainly would not have resulted in Lynch's acquittal. Courts have long recognized that prosecutorial decisions inevitably involve difficult choices about resource allocation, and the

government possesses broad discretion to say where those resources should be deployed. *See Wayte v. United States*, 470 U.S. 598, 607 (1985). The prosecutor's statement merely expressed what those priorities were here. It never indicated that Lynch's compliance or noncompliance with state law would have had any effect on Lynch's substantive guilt. Lynch also would not have been entitled to acquittal even if he had shown that he was in compliance with state law, because such compliance was not relevant to the federal crimes he was charged with. *See Raich*, 545 U.S. at 29.

Lynch suggests that the information about prosecutorial priorities was favorable to his defense because it suggested that testimony given by DEA Agent Reuter was perjurious and thus violative of Lynch's due process right not to be convicted by testimony known by the state to be perjurious. *See Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959). But this argument also depends on a misreading of that testimony. Agent Reuter stated that neither she nor anyone in her office would have told Lynch that dispensaries were permissible if in compliance with state and local law, because "federal law has nothing to do with state and local officials. We would be investigating the federal law . . . . It doesn't matter what the state or local officials say or do." It is entirely reconcilable—and thus not at all suggestive of perjury—to say that a dispensary is always subject to investigation when illegal under federal law, but practically most likely to be prosecuted when also committing state law violations too. Moreover, Agent Reuter was testifying about the investigative practices of her DEA office, while the prosecutor's statement explained the charging decisions of that office. It is also not suggestive of perjury that two different government agencies operate differently or explain their roles in different terms.

Lynch finally suggests that this information would have allowed him to question Agent Reuter on the proposition that, if Lynch had been in compliance with state law, he would not have been investigated or prosecuted. Such an argument would border on the frivolous, however. Lynch may be correct that his chances of being caught would have been lower if he had been in compliance with state law, but this is not the same as saying that Lynch was actually innocent of any crimes of which he was convicted.

For those reasons, then, Lynch does not demonstrate any error in the district court's handling of the evidence at his trial.

## C. Entrapment by Estoppel Defense

Lynch contends that the district court committed various errors with respect to Lynch's entrapment by estoppel defense. The court allegedly misinstructed the jury about this defense's elements, refused to allow the defense as against the distribution-to-minors charges, and did not permit the jury to consider evidence of Lynch's compliance with state law. All of Lynch's arguments on this point fail, however, because Lynch did not prove facts sufficient to establish a basis for entrapment by estoppel. Lynch therefore has no grounds to object to the district court's treatment of this defense, because Lynch's failure to provide a sufficient factual basis to establish the defense meant that Lynch was not entitled to any instruction on, or jury consideration of, this defense in the first place.

Lynch's proposed basis for the entrapment by estoppel defense was Lynch's trial testimony that, in September 2005 and before opening CCCC, Lynch had allegedly called the local DEA office and reached a man at the office, whose name or position Lynch did not know. Lynch stated that he

had inquired of this person "what you guys are going to do about all of these medical marijuana dispensaries around the State of California." Lynch testified that the person responded that "it was up to the cities and counties to decide how they wanted to handle the matter." Lynch then allegedly specifically told the man that he intended to open a dispensary, and the man repeated that same thing that he had told Lynch before, that it was "up to the cities and counties to decide." Lynch contends that he relied on this statement in opening CCCC, and would not have commenced operations if he had been told that his proposed activities were illegal.[2] At trial, the district court allowed Lynch to seek to claim this defense with regard to counts 1, 4, and 5—general distribution, possession with intent to distribute, and maintaining a drug-involved premises—but refused to allow this defense as against counts 2 and 3—the distribution to minors charges—because it held that Lynch had not established any foundation for that defense to apply to these charges.

Lynch contends that the information allegedly given to him in his phone call to the DEA sufficed to allow him a defense of entrapment by estoppel and that the district court committed various errors with respect to that defense, but this phone call was insufficient to provide a basis for the defense. Although it is true that a defendant is generally

---

[2] The government contends that Lynch's testimony on this point is highly doubtful because, although Lynch's phone records reflected that he had in fact called the DEA, the agent whose number Lynch dialed was female rather than the man identified by Lynch, and that agent also testified at trial that neither she nor any agent in her division would have given Lynch the information Lynch claimed to have received. We do not reach the issue of the credibility of Lynch's testimony, however, because even taking his account as true, Lynch did not provide a sufficient factual basis for any instruction on entrapment by estoppel.

"entitled to have the jury instructed on his or her theory of defense," this entitlement does not apply "where the evidence, even if believed, does not establish all of the elements of a defense." *United States v. Perdomo-Espana*, 522 F.3d 983, 986–87 (9th Cir. 2008) (quoting *United States v. Arellano-Rivera*, 244 F.3d 1119, 1125 (9th Cir. 2001) (internal quotation marks omitted)). Even crediting Lynch's testimony that the phone call occurred and that he was told that "it was up to the cities and counties to decide how they wanted to handle the matter" of marijuana dispensaries, Lynch still lacked crucial elements to shield himself under the defense of entrapment by estoppel.

To establish the defense of entrapment by estoppel, a defendant has the burden to show: "(1) an authorized government official, empowered to render the claimed erroneous advice, (2) who has been made aware of all the relevant historical facts, (3) affirmatively told [the defendant] the proscribed conduct was permissible, (4) that [the defendant] relied on the false information, and (5) that [the] reliance was reasonable." *United States v. Schafer*, 625 F.3d 629, 637 (9th Cir. 2010) (quoting *United States v. Batterjee*, 361 F.3d 1210, 1216 (9th Cir. 2004)). Assuming that Lynch's testimony could be believed to show that Lynch spoke to an authorized official and that Lynch relied on the information given to him, the other elements of the defense were missing here.

The statement that "it was up to the cities and counties to decide how they wanted to handle the matter" was not the affirmative authorization that Lynch needed to identify to have been entitled to any instruction or evidence introduced on entrapment by estoppel. At most, Lynch's evidence suggests that federal authorities were confused about how to handle a complex and evolving area, but this is not the same

as saying that Lynch was actively told he could violate federal law. "[T]o invoke estoppel against the Government, the party claiming estoppel must show 'affirmative misconduct' as opposed to mere failure to inform or assist." *Lavin v. Marsh*, 644 F.2d 1378, 1382 (9th Cir. 1981). Even on Lynch's version of the facts, the person he talked to may have been unhelpful in failing to remind Lynch that marijuana remained illegal under federal law, but he never told Lynch that Lynch's proposed activities were legal. We generally refuse to recognize a defense of entrapment by estoppel where a defendant shows that a government agent only failed to tell a defendant that proposed conduct was illegal, as opposed to affirmatively stating that it was legal. *See United States v. Brebner*, 951 F.2d 1017, 1026 (9th Cir. 1991). Even crediting Lynch's testimony for all that it is worth, Lynch never received the sort of clear sanction that entrapment by estoppel requires.

In particular, the ambiguity of the statement that it was "up to the cities and counties to decide" means that the statement lacked sufficient concreteness to have served as an affirmative authorization for Lynch's activities. To establish affirmative authorization, a "defendant must do more than show that the government made 'vague or even contradictory statements.'" *United States v. Ramirez-Valencia*, 202 F.3d 1106, 1109 (9th Cir. 2000) (quoting *Raley v. Ohio*, 360 U.S. 423, 438 (1959)). Instead, the defendant "must show that the government affirmatively told him the proscribed conduct was permissible." *Id.* Even if Lynch took the statement as implicit authorization for his actions, this is not the same as saying that the statement was an affirmative and unambiguous grant of permission. The statement could have meant other (and more plausible) things: that the federal government would prioritize prosecuting those dispensaries most violative of state and

local law; that, although such dispensaries were not legal, the government would generally not investigate without a state or local government requesting investigation; that, in the absence of federal prohibition, regulation would be up to the cities and states. The vagueness and ambiguity of the statement therefore did not allow it to serve as a basis for a claim of entrapment by estoppel.

In addition, even to the extent that Lynch might have (improperly) understood the statement to be an affirmative authorization, any reliance on the statement was clearly unreasonable. The determination of reasonable reliance is a relatively common-sense inquiry: reasonable reliance occurs if "a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries." *United States v. Batterjee*, 361 F.3d 1210, 1216–17 (9th Cir. 2004) (quoting *Ramirez-Valencia*, 202 F.3d at 1109). Thus, for example, in *Batterjee*, we held that a defendant dealing with the complicated intersection of immigration and criminal law, who had been told by a federal licensee that he was "legally purchasing and possessing a firearm," could reasonably rely on those assurances, because there was no reason for him to have believed he need inquire any further. *Id.* at 1217.

Here, by contrast, Lynch clearly should still have been on notice that any purported categorical authorization to violate the federal drug laws was incorrect, or at least demanded further inquiry into the validity of that authorization. Before he made the call, Lynch had been actively following developments of marijuana law in California and throughout the United States. Indeed, about six months before the alleged call, *Raich* had established that the federal government had the power to prosecute crimes

even if legal under state law, and Lynch had testified that he was aware this case was ongoing. Even if it might be too much to say that Lynch should be charged with precisely understanding Supreme Court doctrine, a reasonable person with the knowledge Lynch had would, at minimum, have understood the relationship between state and federal regulation of marijuana to be a subject of significant legal complexity. It was not reasonable to think that two questions posed to an anonymous and apparently confused source could have definitively resolved all legal questions relating to Lynch's operations.

In particular, Lynch's alleged reliance on the call could not have been reasonable because it required Lynch to ignore vast swaths of information he had about marijuana's illegality under federal law. For example, in the controversy leading to the closure of the store in Atascadero, the city attorney had told Lynch that marijuana distribution was illegal for all purposes under federal law. Lynch also testified that before making the call to the DEA, he had gone on the DEA website and discovered the fact that marijuana was illegal under federal law, specifically that it is a Schedule One drug. In addition, Lynch collected books, legal memoranda, and other materials on the legal status of marijuana, and many of these indicated that marijuana was illegal under federal law, regardless of state legality. Nor had Lynch somehow missed the point contained in all these materials. Even after making the call, Lynch distributed forms stating that CCCC recognized "that Federal Law prohibits Cannabis," although the forms also included an incorrect statement that California legalization had created an exception to the federal prohibition through the Tenth Amendment.

It was therefore flatly unreasonable for Lynch to have relied on this purported statement from the DEA, because Lynch had ample cause to recognize that anything he took to be an authorization for his activities might have been incorrect or incomplete. A defendant's reliance on an alleged authorization is unreasonable where such reliance ignores other relevant information the defendant has about the subject. For example, we have recently held that marijuana distributors who allegedly received bad information from a state sheriff's department could not claim entrapment by estoppel, because they knew that marijuana remained illegal under federal law. *United States v. Schafer*, 625 F.3d 629, 638 (9th Cir. 2010).

The same principle applies here. Even crediting Lynch's version of the call, a reasonable person possessing all the information Lynch had would not have considered the call decisive of what the law required. Rather, a reasonable person would at least have sought to resolve the two apparently contradictory conclusions Lynch had about what the law was. In contrast, in *Batterjee*, we emphasized the reasonableness of a defendant's reliance on incorrect but apparently plausible advice on the basis that he had made further inquiries even after receiving that advice. *See Batterjee*, 361 F.3d at 1216–17. Because Lynch instead simply cut off his inquiries when he allegedly heard what he wanted to hear, ignoring all information he had to the contrary, any reliance he made on the call was unreasonable, and the call was therefore insufficient to sustain a defense of entrapment by estoppel.

In short, because Lynch did not show facts providing a basis on which a reasonable jury could find that he was entitled to this defense of entrapment by estoppel, he was not entitled to present this defense in the first place. The district

court therefore did not err in any decisions it made with respect to entrapment by estoppel, because that defense simply did not apply to Lynch.

## D.  Caution Against Nullification

Lynch assigns error to a warning against nullification given by the district court at voir dire. This warning was permissible, however, because it was an appropriate exercise of a district court's duty to ensure that a jury follows the law, and it was additionally justifiable given that the need for the warning was a risk that Lynch's counsel had himself invited.

In the run-up to Lynch's trial, Lynch's lawyer, perhaps recognizing that Lynch's guilt was clear, appears to have sought to encourage prospective jurors that they did not need to convict Lynch even if he was factually and legally guilty of his crimes.  For example, on the first day of voir dire, Lynch's lawyer told prospective jurors that, among other things, "the judge is only going to tell you what the law is, and that ultimate decision about what to do in this case is for you and only you to decide," and "there is nobody above you and . . . you [are] the person that's got to decide what to do." On the second day of voir dire, the government objected that these statements seemed to be calling for jury nullification, and the district court cautioned Lynch's counsel at a sidebar not to ask questions seeking jury nullification.   Within minutes of receiving this warning, however, Lynch's counsel returned to the line of statements he had been making before, asking jurors whether they agreed that "whether to find a person guilty or not guilty is your decision."

Finally, one juror got the drift and responded to Lynch's counsel, "I understand that completely.  I believe there is something called jury nullification, that if you believe the

law is wrong, you don't have to convict a person." The district court halted voir dire, and, after consultation with the attorneys, gave the following caution to the prospective jurors:

> Nullification is by definition a violation of the juror's oath which, if you are a juror in this case, you will take to apply the law as instructed by the court. As a . . . juror, you cannot substitute your sense of justice, whatever it may be, for your duty to follow the law, whether you agree with the law or not. It is not your determination whether the law is just or when a law is unjust. That cannot be and is not your task.

The district court then asked each individual prospective juror if he or she could abide by that instruction. Each juror agreed to so abide.

The district court's caution against nullification was permissible. It is clear that "no juror has a right to engage in nullification," that such nullification is "a violation of a juror's sworn duty to follow the law as instructed by the court," and, to that end, "trial courts have the duty to forestall or prevent such conduct," including "by firm instruction or admonition." *Merced v. McGrath*, 426 F.3d 1076, 1079–80 (9th Cir. 2005) (quoting *United States v. Thomas*, 116 F.3d 606, 617 (2d Cir. 1997)). The district court's caution to the jurors that they should not substitute their own sense of justice for their duty to find facts pursuant to the law was entirely appropriate as a discharge of the court's own duty to forestall lawless conduct.

Moreover, the particular language chosen by the district court accurately stated the law. The first part of the

statement, that "nullification is, by definition, a violation of the juror's oath to apply the law as instructed by the court" is a quote from *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997), a case recognized by this court as an accurate guide to a judge's duty to prevent nullification. *See Merced*, 426 F.3d at 1079. The other part of the statement, that a juror "cannot substitute your sense of justice . . . for your duty to follow the law" and that it was "not your determination whether a law is just . . ." comes from *United States v. Rosenthal*, 266 F. Supp. 2d 1068, 1085 (N.D. Cal. 2003), *affirmed in part, reversed in part*, 454 F.3d 943 (9th Cir. 2006). This court has explicitly recognized that these sentences from *Rosenthal* are generally permissible as instructions to a jury to follow the law. *United States v. Kleinman*, *reissued as* 880 F.3d 1020, 1032 (9th Cir. 2018). The district court's caution was therefore allowable, both in the choice to have given it, as well as the language chosen to convey that message.

Lynch argues that the caution was impermissible because this court in its recent *Kleinman* opinion has determined that an anti-nullification instruction will be improper if it "state[s] or impl[ies] that (1) jurors could be punished for jury nullification, or that (2) an acquittal resulting from jury nullification is invalid." *Kleinman*, 880 F.3d at 1032. We held that one portion of the instruction given in *Kleinman* crossed this line because it "could be construed to imply that nullification could be punished, particularly since the instruction came in the midst of a criminal trial," and that another portion was also incorrect because it "could be understood as telling jurors that they do not have the power to nullify, and so it would be a useless exercise." *Id.* at 1032–33. In this case, in contrast, there was no indication that nullification would place jurors at risk of legal sanction or otherwise be invalid. The district court

correctly stated that the jurors did not have any right to nullify, but it did not tell them that they lacked the actual ability to do so.  It also neither said nor implied that jurors would be subject to punishment if they acquitted Lynch. Lynch identifies a post-conviction letter written by one juror stating he was concerned "we would be breaking our promise if we did not vote to convict."  This appears to be nothing more than a reflection of the fact that the evidence against Lynch was so overwhelming that a juror could not acquit Lynch without violating the juror's duty to find facts according to the law, however, given that Lynch had admitted all facts necessary and sufficient to find him guilty.

The district court's warning involved no language like that determined to be impermissible in *Kleinman*.  Indeed, the strongest portion of the district court's caution in this case was specifically approved in *Kleinman*. *See Kleinman*, 880 F.3d at 1032.  This case is also factually distinguishable from *Kleinman* because of the circumstances in which the anti-nullification instruction came about.  In *Kleinman*, the district court issued its warning against nullification during jury instructions, sua sponte, and without any indication that nullification was on any juror's mind.  *See Kleinman*, 880 F.3d at 1031.  Here, by contrast, the warning directly followed from a potential juror at voir dire indicating an unwillingness to follow the law.

The court's caution was, moreover, particularly justified because it occurred on the second day of Lynch's counsel's asking questions suggestive of nullification, and after the court's explicit admonishment to Lynch's lawyer not to ask such impermissible questions.  As we have stated, albeit in a somewhat different context, "an error that is caused by the actions of the complaining party will cause reversal only in the most 'exceptional situation.'" *United States v. Schaff*,

948 F.2d 501, 506 (9th Cir. 1991) (quoting *Guam v. Alvarez*, 763 F.2d 1036, 1038 (9th Cir. 1985) (internal quotation marks omitted)). A legally accurate warning given in response to a potential juror proposing to disregard the law clearly is not such an exceptional situation.

Lynch more generally suggests that the district court's instruction inhibited the jurors from being willing to nullify the charges against him, but this was also not a violation of any legal right. "[W]hile jurors have the power to nullify a verdict, they have no right to do so." *Merced*, 426 F.3d at 1079. The district court's admonition that nullification was a violation of a jury's duty to follow the law did not deprive the jurors of their ability to nullify, since nullification is by its nature the rejection of such duty. The district court therefore did not commit any error in issuing its caution against nullification.

### E. Jury Ignorance about Mandatory Minimums

Lynch argues that the district erred in not allowing him to inform the jury of the mandatory minimum sentence that he faced if convicted. This argument is without merit, however, because "[i]t is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)); *see also United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1991) (same). The district court therefore did not abuse its discretion in not allowing the jury to consider information that was beyond the jury's purview.

Lynch contends that *Shannon* and the principles it embodies have been undermined by *Crawford v. Washington*, 541 U.S. 36, 51 (2004), and *Apprendi v. New*

*Jersey*, 530 U.S. 466, 490 (2000), which Lynch argues support the very general proposition that the Sixth Amendment protects any jury power that existed at the time of the amendment. The Second Circuit has squarely rejected this argument for reasons that are also decisive here. *See United States v. Polouizzi*, 564 F.3d 142, 160 (2d Cir. 2009). *Apprendi* and *Crawford* do not deal with jury knowledge of sentencing prospects. *See id.* To the extent that the very general principles in *Apprendi* and *Crawford* could also lead the Supreme Court to overrule *Shannon* in the future, "that is a decision we must leave to the Supreme Court." *Id*. *Shannon* remains binding law until an inconsistent decision issues from the Supreme Court, and the district court's actions were appropriate in light of *Shannon*.

Lynch also argues that he was entitled to inform the jury about the mandatory minimum sentence he faced on the basis of an exception articulated in *Shannon*, that "an instruction of some form may be necessary under certain limited circumstances," such as "to counter . . . a misstatement." *Shannon*, 512 U.S. at 587. Lynch contends that the jury instructions that "[t]he punishment provided by law for this crime is for the court to decide" was such a misstatement, in that it allegedly suggested that the district court would exercise discretion at sentencing. This argument misreads *Shannon*. *Shannon* cautioned that such correctives are "not to be given as a matter of general practice" and should only be applied to correct obvious misrepresentations, such as a statement "that a particular defendant would 'go free' if found [not guilty by reason of insanity]." *Shannon*, 512 U.S. at 587. Stating that a judge sentences according to the law is not such a misrepresentation. It was therefore not an abuse of discretion for the district court not to have informed the jury about the potential punishments Lynch faced if convicted.

## F.  District Court Communications to the Jury

Lynch raises three challenges to the court's handling of jury communications—that the district court allegedly permitted ex parte communications, declined to answer juror questions, and barred jurors from asking substantive questions of witnesses—but all these challenges fail because the court did not actually permit any ex parte communications, and the other limitations were reasonable exercises of a district court's power to manage its trial proceedings.

At the start of trial, the district judge informed the jurors that they could communicate with him via the clerk by means of signed note.  Jurors had asked the court clerk about the possibility of asking questions, apparently of witnesses, and the district court had informed the jury that it did not allow questions from jurors in criminal cases, owing to the potential for evidentiary misconduct.  Five days into trial, the court informed the attorneys that a juror had inquired about the status of the sheriff's department and the DEA, and that question had been resolved by subsequent questioning. Later that day, a juror asked the clerk about the definitions of the terms "minor" and "hash," and, with approval from the attorneys, the district court read a definition of "minor" from the proposed jury instructions.  The next day, the district court stated that several members of the jury had inquired of the clerk what Rule 403 was, and the district court answered that it would not explain the rule, because those considerations were not appropriate for the jury. Finally, a day later, the district court informed the parties that the jurors had continued to ask the clerk questions.  Defense counsel asked what questions those were, but the district court declined to answer.

The district court instead summoned the jury and stated to them, pursuant to the court's first instruction, that "jurors were not going to be allowed to ask substantive questions" during trial, although the court would answer questions of procedure.  After presentation of evidence concluded, the district court did permit the jury to ask questions about the instructions, and also stated that it would answer any clarifying questions if there was disagreement as to the instructions during deliberations.  No jurors asked any questions then, however.

Lynch places a great deal of emphasis on what he views as improper ex parte contact between jurors and the court, but there was no error in any of these circumstances, because those things about which Lynch now complains were neither ex parte, nor even communications to the jury.  All of the messages went entirely in one direction: from jurors to court.  Lynch's only allegations are that the court clerk received information from the jurors and conveyed that to the judge, but this is not the same as saying that either the clerk or the judge responded with communications to the jurors.

In other words, none of this contact rose to the level of communications, and so none could have been an improper ex parte communication.  This court has suggested that an impermissible ex parte communication occurs only if "anything about the facts or the law" of a case has been imparted to the jury. *Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co.*, 206 F.3d 900, 906 (9th Cir. 2000).  Receiving a note and passing it along simply does not rise to this level of conveying anything about facts or law, however.  Lynch appears to contend that a bright-line rule prohibits a district court from receiving any note from a juror, but such a view is clearly incorrect.  The Supreme Court has held that a juror's conveying something to a judge does not justify

reversal on those grounds alone, because such contact is simply part of the "day-to-day realities of courtroom life." *Rushen v. Spain*, 464 U.S. 114, 118–19 (1983).  Lynch therefore fails to surmount the threshold hurdle to argue for the presence of improper ex parte communications between the court and the jurors.

Lynch also argues that the district court had an obligation to disclose the contents of the questions asked to it by the jury, but the court's nondisclosure was within the district court's authority to manage the conduct of a trial.  In this case, this district court had stated at the beginning of trial that it would not allow jurors to ask questions of witnesses, and that their responsibility was to receive evidence, rather than inquire of it for themselves.  This prohibition was clearly within the court's power to impose, since a court has the authority to permit limited jury questioning of a witness, *United States v. Huebner*, 48 F.3d 376, 382 (9th Cir. 1994), or to prohibit it altogether.  Lynch suggests that the district court exceeded its authorization when it subsequently told the jury that they "were not going to be allowed to ask substantive questions" during trial, although the district court would answer questions of procedure.  Lynch's argument ignores the court's "broad discretion in supervising trial[]," subject to reversal only for abuse of discretion. *Price v. Kramer*, 200 F.3d 1237, 1252 (9th Cir. 2000).  Lynch offers no reason to think that the district court abused its discretion here, especially given that the court did subsequently offer the jury chances to ask questions that the court could properly answer once presentation of evidence had concluded.

Lynch most creatively contends that the district court's refusal to disclose to Lynch the contents of the notes it received from the jury violated Lynch's right under Fed. R.

Crim. P. 43(a) to be present at all critical stages of his trial. But Lynch was present during all critical stages. The fact that neither Lynch nor his counsel were told the contents of a jury note does not go to presence. Such an argument would preclude any ex parte communication during trial, no matter how warranted. Lynch provides no authority for such a rule, and this argument clearly also fails.

### G.  Lynch's Sentence

Because Lynch was convicted of narcotics conspiracy, he was subject to a five-year mandatory-minimum sentence under 21 U.S.C. § 841(b)(1)(B)(vii), and the district court erred in not applying that sentence to Lynch. In particular, the district court declined to sentence Lynch to this mandatory-minimum because it determined that Lynch was eligible for a safety-valve provision, 18 U.S.C. § 3553(f), allowing a court to sentence a defendant below what a mandatory minimum would otherwise require. Lynch was not eligible for application of the safety valve to him, however, given his role leading CCCC, and he was therefore required to be sentenced to the five-year mandatory-minimum.

After his conviction, Lynch was potentially subject to two mandatory minimum sentences: a one-year mandatory minimum for distribution to persons under the age of 21, *see* 21 U.S.C. § 859(a), and a five-year mandatory minimum for the total amount of marijuana in his conspiracy, *see* 21 U.S.C. § 841(b)(1)(B)(vii). The district court was reluctant to sentence Lynch to these mandatory minimums, given what it reasoned was the unusual fact of Lynch's lack of clandestine activity and general intent to comply with state law.

The district court therefore took advantage of the so-called "safety-valve" provision, 18 U.S.C. § 3553(f), under which a court need not apply an otherwise-required mandatory minimum. The court recognized, however, that Lynch potentially had not satisfied a precondition for the safety valve to apply—that "the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines." *See* 18 U.S.C. § 3553(f)(4). As the Guidelines so define the terms, the "organizer or leader" and "manager or supervisor" enhancements apply to any person who plays such a role in any criminal activity involving five or more participants, U.S.S.G. § 3B1.1, and Lynch's activities clearly did involve more than five participants. The district court held, however, that "being such an organizer/leader over another participant simply qualifies a defendant for an adjustment; it does not require it." The district court cited to the Commentary to the Guidelines and stated that a larger principle applied: "when the evidence clearly shows that the defendant in question did and does not present a greater danger to the public . . . is not likely to recidivate, that individual should not be considered as falling within USSG § 3B1.1 for purposes of an upward adjustment."

The district court did, however, also determine that it could not apply the safety valve to Lynch's § 859(a) violations, because the safety valve applies only to a small number of sections of the criminal code, of which § 859 is not one. The district court therefore sentenced Lynch to one year and one day in prison.

The district court erred in applying the safety valve to Lynch. By its own terms, the safety valve does not apply to "an organizer, leader, manager, or supervisor of others in the offense as determined under the sentencing guidelines."

18 U.S.C. § 3553(f)(4). The sentencing guidelines in turn state that a four-level enhancement applies to a defendant who is "an organizer or leader of a criminal activity that involved five or more participants." U.S.S.G. § 3B1.1(a). The relevant note further defines leadership and organizer status as involving a totality-of-the-circumstances inquiry, including:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* n.24.

Lynch's activities at CCCC clearly made him a leader and organizer of that enterprise, according to the Guidelines' definition. Lynch planned the venture, hired employees, ran the finances, and generally served as the primary person in the enterprise. There is also no factual dispute that Lynch's activities involved more than five participants: CCCC had about ten employees. The presence of those factors means that Lynch qualified as a leader, as defined under the sentencing guidelines, and so the safety valve was not available to reduce Lynch's sentence here.

Although recognizing that "Lynch did put together CCCC's operations which had about ten employees," the district court decided that Lynch was eligible for safety-valve relief, because it determined that the atypicality of the way in which Lynch was a leader of CCCC justified a lower-

than-minimum sentence. This conclusion was an error. "It is axiomatic that a statutory minimum sentence is mandatory." *United States v. Sykes*, 658 F.3d 1140, 1146 (9th Cir. 2011). Although Lynch's circumstances may have been unusual, in the sense that his was not the sort of furtive scheme typical of many drug-distribution cases, Lynch's role was clearly that of a leader, and he was thus ineligible for safety-valve relief. We have explained that the safety valve is "a narrow exception to the statutory regime established by the Mandatory Minimum Sentencing Reform Act," *United States v. Yepez*, 704 F.3d 1087, 1091 (9th Cir. 2012), and no relief exists outside of the five specific conditions for its application. Because the requirement that a defendant not be a "organizer, leader, manager, or supervisor of others" was one such precondition for operation of the safety valve, Lynch's unquestioned status as such a head of CCCC closed the door on any effort to classify him as eligible for the safety valve.

Lynch attempts to defend the district court's sentence on the grounds that a defendant's qualification for § 3B1.1 enhancement allows but does not necessarily require the rejection of safety-valve relief, but this argument fails. Courts have consistently applied the leadership guideline to defeat the safety valve without any consideration that this application is discretionary. *See United States v. Irlmeier*, 750 F.3d 759, 764 (8th Cir. 2014); *United States v. Ortiz*, 463 F. App'x 798, 800 (10th Cir. 2012); *United States v. Pena-Gonell*, 432 F. App'x 134, 137 (3d Cir. 2011); *United States v. Arroyo-Duarte*, 367 F. App'x 420, 422–23 (4th Cir. 2010); *United States v. Sainz-Preciado*, 566 F.3d 708, 715 (7th Cir. 2009); *United States v. Lopez*, 217 F. App'x 406, 408 (5th Cir. 2007); *United States v. Kerley*, 230 F. App'x 919, 923 (11th Cir. 2007); *United States v. Anglon*, 88 F.

App'x 428, 432 (1st Cir. 2004); *United States v. Bazel*, 80 F.3d 1140, 1143 (6th Cir. 1996).

A remand is required because the district court erred in holding that it had discretion to apply the safety valve to Lynch, given Lynch's unquestionable status as the leader of CCCC, an organization involving more than five participants.

## H. Reassignment on Remand

The United States requests that this case be reassigned to another district judge for resentencing, but we reject this request. Reassignment on remand is highly discouraged, and such a motion will be granted "only in unusual circumstances or when required to preserve the interests of justice." *United States v. Wolf Child*, 699 F.3d 1082, 1102 (9th Cir. 2012). Such circumstances and interests are not present here. We have articulated three factors relevant to the consideration of whether the particular circumstances of a case meet the high standard required to justify reassignment:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving appearance of fairness.

*Manley v. Rowley*, 847 F.3d 705, 712 (9th Cir. 2017) (quoting *Wolf Child*, 699 F.3d at 1102).

The facts of this case do not warrant reassignment under that standard. There is no cause to expect that the district court would reject instructions from this court, or that reassignment would otherwise be necessary to preserve the appearance of justice or ensure the efficiency of the federal courts. The district court repeatedly emphasized that its sentencing was not an act of unbounded discretion, but rather was determined by precedents from this court, as well as obligations from statute. That the district court adopted an incorrect reading of the statute does not mean that it cannot be expected to apply the correct law on remand.

The government argues that this case should be reassigned because the district court expressed views about the undesirability of the five-year mandatory minimum as applied to Lynch, but this argument is a failing one. The district court acknowledged it had a view about the sentence it would prefer to impose if granted unbounded discretion, but also made clear that it would only exercise its discretion if permitted to by law.

## I. Spending Provision

Following his conviction, Lynch has raised the additional issue of whether the § 538 appropriations rider applies to him and therefore requires dismissal of his conviction. The rider raises several difficult questions with respect to Lynch's case, including, among others, whether the provision operates to annul a conviction otherwise properly obtained before its passage. We need not now address the substance of how the rider operates with respect to Lynch, however, because it is not clear that the rider applies to him at all. The rider covers only persons in total

compliance with state law, and it is contestable whether this so describes Lynch and his activities. Remand is therefore warranted to determine whether Lynch was in compliance with state law.

As relevant here, the appropriations rider provides that: "[n]one of the funds made available in this Act to the Department of Justice may be used, with respect to . . . California . . . to prevent [it] from implementing [its] own laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Consolidated Appropriations Act of 2017 § 537, Pub. L. 115-31, 131 Stat 135. Congress first passed the rider in 2014, and it has been adopted by every subsequent appropriations act, including the currently operative one. *See* Consolidated Appropriations Act of 2017 § 537, Pub. L. 115-31, 131 Stat 135, *extended by* Continuing Appropriations Act of 2018, Division D, Pub. L. 115-56, 131 Stat 1129. Although not necessarily clear from the face of the text, we have held that this measure "prohibits DOJ from spending funds from relevant appropriations acts for the prosecution of individuals who engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws." *United States v. McIntosh*, 833 F.3d 1163, 1177 (9th Cir. 2016).

To say that the rider exists is therefore not enough to end Lynch's prosecution because, as the *McIntosh* court emphasized, the provision has a limited effect. The rider "does not provide immunity from prosecution for federal marijuana offenses," and, because the provision did not purport to repeal the Controlled Substances Act, even state-legal marijuana activity, "remains prohibited by federal law." *Id.* at 1179 & n.5. To that end, *McIntosh* also confirmed that the government continues to possess the

power to prosecute "[i]ndividuals who do not strictly comply with all state-law conditions," and that "prosecuting such individuals does not violate [the spending provision]." *Id.* at 11798; *see also United States v. Gloor*, 725 F. App'x 493, 495–96 (9th Cir. 2018) (holding that a person who does not strictly comply with state law is not covered by the rider). In short, the rider may mean that Lynch has some argument that the government cannot now spend money to prosecute him, but if and only if Lynch had been strictly compliant with California law.

It is unclear from this record whether Lynch's activities were so strictly compliant with state law. California offered two pathways for a person like Lynch to be permitted to engage in marijuana-related activities. First, California's medical marijuana statute covers certain marijuana-related activities by a patient, and by a patient's "primary caregiver." Cal. Health & Safety Code § 11362.5(d). This "primary caregiver" pathway almost certainly did not apply to Lynch and his activities. The California Supreme Court has held that a person in the position of Lynch, who acts only as a supplier of marijuana, is not a primary caregiver and is thus not in compliance with this medical marijuana statute. *People v. Mentch*, 45 Cal. 4th 274, 284–85 (2008). In consequence, the district court determined in its sentencing memorandum that "the CCCC was not operated in conformity with California state law . . . as held by the California Supreme Court in *Mentch*."

On appeal, Lynch contends that his actions were in compliance with California law because there was another California statute also allowing medical marijuana collectives and cooperatives, and Lynch argues that CCCC was one of these. *See* Cal. Health & Safety Code § 11362.775(a). Although potentially closer, in the sense of

not having been expressly ruled out by California Supreme Court precedent, it is questionable whether CCCC was a cooperative as that statute so defines the term. Among other things, CCCC was structured as a sole proprietorship rather than a collectively owned non-profit, *see* Cal. Health & Safety Code § 11362.765, and it is unclear whether CCCC's clientele consisted solely of patients or persons with an identity card, *see* Cal. Health & Safety Code § 11362.71. The district court also expressed its view that there was "no indication" that CCCC was a collective, and Lynch had also conceded in his response to the government's sentencing memorandum that he "does not dispute the government's assertion that he made no attempt to operate as a classic collective."

It is appropriate to remand this case for a factual determination from the district court as to whether Lynch's activities were in compliance with state law, and particularly whether CCCC operated under the required collective form. A decision whether Lynch strictly complied with California marijuana laws may depend on specific findings of fact, as well as legal determinations, and it is proper to allow the district court to find those facts in the first instance. If Lynch was not compliant with state law, he is not covered by the rider and is subject to the penalties of his conviction. Should the district court resolve the state-law-compliance issue in Lynch's favor, the court may then rule in the first instance on the legal issues that such a determination would raise.

## IV.  Conclusion

We **AFFIRM** Lynch's conviction and **REMAND** the case to the district court for proceedings consistent with this opinion.

WATFORD, Circuit Judge, dissenting:

I would reverse and remand for a new trial. In my view, the district court went too far in trying to dissuade the jury from engaging in nullification. The court's actions violated Charles Lynch's constitutional right to trial by jury, and the government can't show that this error was harmless beyond a reasonable doubt.

By its very nature, a case of this sort touches a sensitive nerve from a federalism standpoint. At the time of Lynch's trial in 2008, the citizens of California had legalized the sale and use of marijuana for medicinal purposes; the federal government nonetheless sought to prosecute a California citizen for conduct that arguably was authorized under state law. Because federal law takes precedence under the Supremacy Clause, the government could certainly bring such a prosecution, notwithstanding the resulting intrusion upon state sovereignty interests. *See Gonzales v. Raich*, 545 U.S. 1, 29 (2005). But the Framers of the Constitution included two provisions that act as a check on the national government's exercise of power in this realm: one stating that "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury"; the other requiring that "such Trial shall be held in the State where the said Crimes shall have been committed." U.S. Const., Art. III, § 2, cl. 3. The Sixth Amendment further mandates that in all criminal prosecutions the accused shall enjoy the right to trial "by an impartial jury of the State and district wherein the crime shall have been committed." Thus, to send Lynch to prison, the government had to persuade a jury composed of his fellow Californians to convict.

One of the fundamental attributes of trial by jury in our legal system is the power of the jury to engage in nullification—to return a verdict of not guilty "in the teeth

of both law and facts." *Horning v. District of Columbia*, 254 U.S. 135, 138 (1920). The jury's power to nullify has ancient roots, dating back to pre-colonial England. *See* Thomas Andrew Green, Verdict According to Conscience: Perspectives on the English Criminal Trial Jury, 1200–1800, at 236–49 (1985) (discussing *Bushell's Case*, 124 Eng. Rep. 1006 (C.P. 1670)). It became a well-established fixture of jury trials in colonial America, perhaps most famously in the case of John Peter Zenger, a publisher in New York acquitted of charges of seditious libel. *See* Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 871–74 (1994). From ratification of the Constitution to the present, the right to trial by jury has been regarded as "essential for preventing miscarriages of justice," *Duncan v. Louisiana*, 391 U.S. 145, 158 (1968), in part because the jury's power to nullify allows it to act as "the conscience of the community," Jeffrey Abramson, We, the Jury: The Jury System and the Ideal of Democracy 87 (1994).

It's true that a jury has no *right* to engage in nullification and that courts are permitted to discourage a jury's exercise of this power. *Sparf v. United States*, 156 U.S. 51, 106 (1895); *Merced v. McGrath*, 426 F.3d 1076, 1079 (9th Cir. 2005). Hence a defendant may not insist that the jury be instructed on its ability to nullify. *United States v. Powell*, 955 F.2d 1206, 1213 (9th Cir. 1992). But that doesn't resolve the question implicated here: May the court instruct jurors that they are *forbidden* to engage in nullification, and if so, how forcefully may the court deliver that message?

Our circuit has held that a court can seek to prevent nullification "by firm instruction or admonition." *United States v. Kleinman*, 880 F.3d 1020, 1032 (9th Cir. 2017) (internal quotation marks omitted). We have upheld an

instruction that advised jurors "you cannot substitute your sense of justice, whatever that means, for your duty to follow the law, whether you agree with it or not.  It's not your determination whether a law is just or whether a law is unjust.  That can't be your task." *United States v. Rosenthal*, 266 F. Supp. 2d 1068, 1085 (N.D. Cal. 2003), *aff'd in relevant part*, 454 F.3d 943, 947 (9th Cir. 2006); *see also United States v. Navarro-Vargas*, 408 F.3d 1184, 1201–04 (9th Cir. 2005) (en banc) (upholding similar instruction given to grand jurors).  I have my doubts about whether we were right to endorse such an instruction, for it affirmatively misstates the power that jurors possess.  Jurors may not have the *right* to substitute their sense of justice for what the law requires, or to determine whether a law is just or unjust, but they unquestionably have the ability to exercise that power—in fact, doing so is the very essence of nullification.

Be that as it may, we held in *Kleinman* that a court crosses the constitutional line when it states or implies that jurors could be *punished* if they engage in nullification. 880 F.3d at 1032–35.  A court may permissibly seek to discourage jurors from returning a verdict contrary to law or fact, but ever since *Bushell's Case*, what a court may not do is coerce jurors into obeying its instructions on the law by suggesting that those who disobey could face fine or imprisonment.  Threats of punishment subvert the jury's longstanding role as a safeguard against government oppression.  *See United States v. Gaudin*, 515 U.S. 506, 510–11 (1995); *Duncan*, 391 U.S. at 155–56.  Perhaps for that reason, even at the time of the Founding, "the ability of jurors to disobey judicial instructions without fear of official reprisal was not in doubt."  Alschuler & Deiss, *supra*, at 912. To members of the Founding generation with fresh memories of the colonists' experience under royal judges, the jury's independence from control by the judiciary

provided assurance that application of national law would rest in the hands of local citizens attuned to the concerns of their community, not in the hands of officials beholden to a distant central government.

The court in this case crossed the line we drew in *Kleinman*. During *voir dire*, the court gave prospective jurors an instruction that largely tracked the one we approved in *Rosenthal*. Critically, though, the court went further by stating: "Nullification is by definition *a violation of the juror's oath* which, if you are a juror in this case, you will take to apply the law as instructed by the court." (Emphasis added.) In *Kleinman*, we held that a materially indistinguishable instruction—stating "[y]ou would violate your oath and the law" by engaging in nullification—was not only improper but an error of "constitutional dimension," for it carried with it the implicit threat of punishment. 880 F.3d at 1031, 1035. That implicit threat is no less present here, even though the court referred only to the jurors' oath without explicitly mentioning "the law." Telling jurors that nullification is a violation of their oath, standing alone, implies the potential for punishment because violating one's oath could be deemed either perjury or contempt, both of which are punishable by fine and imprisonment. *See* 18 U.S.C. §§ 401(3), 1621(1), 1623(a); *Clark v. United States*, 289 U.S. 1, 10 (1933). So, as in *Kleinman*, the court's instruction in this case violated Lynch's Sixth Amendment right to trial by jury.

An instructional error of this nature would appear to defy analysis for harmlessness, since "the effects of the error are simply too hard to measure." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017). The harmlessness inquiry in this context can't turn on an evaluation of the strength of the government's evidence; by definition, nullification involves

a juror's decision to acquit notwithstanding the strength of the evidence. What we would have to assess, then, is whether a juror who was otherwise inclined to nullify might have been dissuaded from doing so by the court's instruction. At least in cases like this one, where nullification was an obvious possibility given the popularity of medical marijuana in California, I don't see how the government could ever prove that a court's unduly coercive anti-nullification instruction had no effect on the outcome.

Nevertheless, we held in *Kleinman* that this precise instructional error is subject to harmless error analysis. Thus, the question remains whether the government can show that the court's erroneous anti-nullification instruction was harmless beyond a reasonable doubt. *Kleinman*, 880 F.3d at 1035. The government cannot make that showing, and indeed it has not even tried. In *Kleinman*, we found the court's instruction harmless because it represented only "a small part of the court's final instructions to the jury, and was delivered without particular emphasis." *Id.* Here, in stark contrast, the court delivered the instruction as a stand-alone admonition at the outset of the case, in a manner that could not have placed greater emphasis on the coercive message the court delivered.

The court gave its anti-nullification instruction during *voir dire* because, in response to a question from defense counsel, one of the prospective jurors stated, "I believe there is something called jury nullification, that if you believe . . . the law is wrong . . . you don't have to convict a person." The court tried unsuccessfully to cut the juror off as soon as she said the words "jury nullification," and then asked to speak with counsel at sidebar. After a brief discussion at sidebar, the court ordered the jurors to leave the courtroom while it continued to discuss the matter with the lawyers.

Nearly 50 minutes later, the court called the prospective jurors back in and immediately asked if anyone had discussed the topic of jury nullification while they were waiting in the hallway. None of the jurors responded affirmatively, but the court gave the contested instruction anyway, informing jurors that nullification would be a violation of the oath they were required to take. The court then polled the prospective jurors in open court and asked each of them, one by one, whether they could follow the court's instruction not to engage in nullification. All but two stated that they could, and the two who indicated that they would have difficulty following the court's instruction were dismissed for cause.

In these circumstances, I do not think we can say beyond a reasonable doubt that any juror who might have been inclined to nullify would have done so regardless of the court's instruction. The instruction was inherently coercive because it implied that any juror who engaged in nullification could be punished for doing so. Only the hardiest of jurors would remain committed to voting her conscience when threatened with the risk of fine or imprisonment. That is particularly true here, where the court required the jurors to affirm in open court that they could follow the court's command not to engage in nullification. Although this occurred at the very outset of trial, none of the court's closing instructions counteracted the coercive effect of its earlier admonition. In fact, one of those instructions drove home the message the court conveyed during *voir dire*: "You must follow the law as I give it to you whether you agree with it or not. . . . You will recall that you took an oath promising to do so at the beginning of the case."

Nor can we say that defense counsel "invited" the court's error. The question defense counsel posed to the prospective

juror who mentioned nullification merely asked whether she understood that "the ultimate decision as to whether to find a person guilty or not guilty is your decision." That question didn't call for a response mentioning jury nullification, and it accurately reflects black-letter law. *See Gaudin*, 515 U.S. at 510. But even if defense counsel somehow goaded the prospective juror into mentioning nullification, that at most gave the court a basis for issuing the instruction we approved in *Rosenthal*. It did not by any stretch authorize the court to give an instruction that suffers from the same constitutional defect we identified in *Kleinman*.

In short, the court's erroneous anti-nullification instruction cannot be declared harmless beyond a reasonable doubt. I would therefore reverse and remand for a new trial.